**UNITED STATES of America,
Appellant,**

v.

**J. H. MORRIS, Appellee.**

**No. 16858.**

United States Court of Appeals
Fifth Circuit.

Feb. 25, 1958.

**644**

Heard L. Floore, U. S. Atty., Clayton Bray, Asst. U. S. Atty., Fort Worth, Tex., Samuel D. Slade, Herbert E. Morris, Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., for appellant.

Bryan Bradbury, Abilene, Tex., for appellee.

Before JONES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This suit arose out of the migrant laborer program established by the United States and Mexico for the administration of arrangements for entry of Mexican nationals into this country for the purpose of contracting as agricultural workers on farms within the United States. Under the Migrant Labor Agreement of 1951 as amended [1] between the United States and the Republic of Mexico and the provisions of 7 U.S.C.A. § 1461 et seq. which implement the International Agreement and authorize the Secretary of Labor to administer the program, the Government of the United States undertakes to guarantee payment of claims [2] for wages determined to be

---

1. Specific authority to enter into such executive agreement was given in 7 U.S. C.A. § 1466.

2. Migrant Labor Agreement of 1951 as amended, Article 32: "The * * * United States guarantees the perform-

owing to Mexican Workers in accordance with Article 30 of the International Agreement. In the main, this is that the Employer shall pay not less than the "prevailing wage" or the contract rate whichever is higher. In turn, the individual American Employer agrees to reimburse the United States for any such claims which the latter is required to pay.[3]

Morris, a cotton grower in Fisher County, Texas, succeeded below on his cross motion for summary judgment, Fed.Rules Civ.Proc. rule 56, 28 U.S.C.A. The Government brings this appeal to determine whether the Court erred in not granting summary judgment against Morris for $108.12 which it had paid to the Republic of Mexico for the benefit of the eight Braceros employed by him during the cotton harvesting season of 1955 (from September 29 to November 11), and who were paid less than the "prevailing rate" for cotton pulling after October 17, 1955. The Secretary of Labor on that date determined that the prevailing wage was $1.75 cwt. The contract rate was $1.55 cwt

It is undisputed that Morris entered into a written agreement[4] with the United States in the terms of 7 U.S.C.A. § 1462 on October 19, 1953. With this agreement still in effect, Morris, on September 29, 1955, entered into the eight Standard Work Contracts covering the individuals for whom the United States made payment for additional wages. These contracts expressly incorporate the international Migrant Labor Agreement in its entirety and specifically provide that "The Employer shall pay the Mexican Worker not less than the prevailing wage rate paid to domestic workers for similar work at the time the work is performed and in the manner paid within the area of employment, or at the rate specified in the Work Contract, whichever is higher. The Determination of the prevailing wage rate shall be made by the Secretary of Labor."[5]

As if these were not sufficient, the final page of the Standard Work Contract which is a form for the entry of the name of the individual worker and pertinent information concerning him, ex-

---

3. ance by Employers of the provisions of this Agreement and Work Contract relating to the payment of wages * * The * * * United States shall, with respect to any such amounts found to be due from a defaulting Employer, pay to the Mexican Worker the amounts determined to be due him within twenty days after the final determination has been made as to the Employer's indebtedness * * *"

7 U.S.C.A. § 1461. "* * * [T]he Secretary of Labor is authorized * * (6) to guarantee the performance by employers of provisions of such contracts relating to the payment of wages * *."

3. Migrant Labor Agreement of 1951 as amended, Article 32: "* * * The Employer shall agree that the Secretary of Labor's determinations as to the Employer's indebtedness for wages * * * shall be final and binding upon him."

7 U.S.C.A. § 1462 requires that before Mexican Workers will be made available to him, each Employer must execute an agreement with the United States "to indemnify the United States against loss by reason of its guaranty of such employer's contracts * * *."

4. "I * * * [T]he Employer hereby agrees:

"(1) To indemnify the United States against loss by reason of its guaranty of the Employer's Work Contracts with Mexican workers;

* * * * *

"II. The Employer further agrees that the Secretary shall have the right to make final determinations with respect to the Employer's indebtedness for wages * * * and that such determinations shall be binding upon him. In the event the Employer fails to pay such indebtedness within 10 days after receipt of notification of such determination, the Secretary may pay as agent for the Employer the amount so determined to be due the Mexican worker. The Employer further agrees that he will be bound by such action of the Secretary and will reimburse the Secretary for the amounts paid pursuant to such determinations * * *."

5. This is also the precise wording of Article 15 of the international Migrant Labor Agreement.

**646**

ecuted by the Bracero and Morris under the supervision of Representatives of the Republic of Mexico and the Secretary of Labor, in each case was filled in at the appropriate blank for wage rate "Harvest cotton by hand pulling $1.55 cwt for pulling * * * or the prevailing wage whichever is higher."

From this seemingly airtight contractual compartment in which Morris was sealed, he nonetheless escaped through summary judgment entered by the Trial Court. The Court, as contended by Morris, held that the provisions in the international Migrant Labor Agreement and the implementing statutes pertaining to posting [6] of notices proclaiming the certification of the work area as one in which domestic agricultural workers are not available required the posting of the prevailing wage which, admittedly, was not done. The Court also held that the provisions setting up the machinery for Joint Determination of contract violations were not complied with, since the Joint Determination was not made within ten days. We do not agree.

At the time that these Work Contracts were entered into (September 29, 1955), no "prevailing wage" had been determined, and hence none was posted anywhere in Fisher County. The first determination was as of October 17, 1955 and, the Government admits, this prevailing wage rate ($1.75 cwt) was not posted in Fisher County at any time.

The Secretary of Labor did, however, give notice of this determination, and subsequent ones, to the Texas Employment Commission, a state agency which the Secretary, under the statute, 7 U.S. C.A. § 1466(1), was authorized to use.

The contention so energetically advanced by Morris is that posting is a condition precedent to his duty to pay any wages above the rate contracted for in September. He insists that Congress, by the provisions of the statute and especially the 1955 Amendment, note 6, supra, intended this notwithstanding the unlimited nature of the liability expressly assumed by him under the Standard Work Contract and the requirements of the Migrant Labor Agreement.

From the words of 7 U.S.C.A. § 1463, note 6, supra, and an examination of the legislative history of that provision,[7] it is clear that the dominant purpose of certification of areas for employment of Mexican laborers was to protect domestic laborers from competition with cheap imported labor. The language of the Amendment added in October 1955 is intended to strengthen that purpose by requiring posting of certification in local employment offices as public notice to all that, in the area certified, there exists, after efforts have been exhausted to recruit an adequate domestic labor force, a shortage of domestic workers, and that employment of foreign workers will not adversely affect the wages and working

6. 7 U.S.C.A. § 1463. The portions italicized were added by the Amendment of August 9, 1955, C. 679, § 3, 69 Stat. 615.
 "No workers recruited under this subchapter shall be available for employment in any area unless the Secretary of Labor has determined and certified that (1) sufficient domestic workers who are able, willing, and qualified are not available at the time and place needed to perform the work for which such workers are to be employed, (2) the employment of such workers will not adversely affect the wages and working conditions of domestic argicultural workers similarly employed, and (3) reasonable efforts have been made to attract domestic workers for such employment of wages and standard hours of work comparable to those offered to foreign workers. *In carrying*

*out the provisions of (1) and (2) of this section, provision shall be made for consultation with agricultural employers and workers for the purpose of obtaining facts relevant to the supply of domestic farm workers and the wages paid such workers engaged in similar employment. Information with respect to certifications under (1) and (2) shall be posted in the appropriate local public employment offices and such other public places as the Secretary may require.*"

7. H.R.Rep. No. 625, 84th Cong., 1st Sess., p. 4 (1955), U.S.Code Cong. and Admin. Service, p. 2844; S.Rep. No. 214, H.R. Rep. 326, 82d Cong., 1st Sess. (1951), U.S.Code Cong. and Admin.Service, p. 1569.

conditions of domestic agricultural workers similarly employed. Because there had been reports that the certification of these matters required under the 1951 Act had been made in superficial ways too far removed from actual conditions in the specific area, Congress, by the Amendment, required consultation with agricultural employers and workers to obtain the facts on available labor supply and wages. It required also that as to items (1) and (2), 7 U.S.C.A. § 1463, note 6, supra, the information be posted. But again, the dominant objective was to make certain that adequate notice was being given to potential American workers so that if the conditions summarized in the certification did not exist, corrective measures could be taken to prevent their displacement by foreign labor.

This is fortified by the obvious fact that the statute is silent on posting of the prevailing wage rate as such. The Secretary could include it as part of item (2), note 6, supra, but this was not expressly required. Indeed, the only mention of posting of wage rates as such is in Article 15 of the international Migrant Labor Agreement which provides for posting in the Migratory Stations in Mexico and the Reception Centers in the United States so that the prospective Mexican Workers[8] may be apprised of the wages being paid in different areas and may bargain with prospective employers.

Thus it may be seen that the entire scheme of the program is to provide American farmers with the labor necessary for crop production without thereby depriving American Workers of available employment. Braceros are made available for that purpose but only if domestic workers are unavailable. It must be realized that the "prevailing wage" for any given activity is not that wage which might prevail if only Mexican Workers were performing the work in the certified area, but rather is the wage rate then being paid to *American* Workers for the same activity in the same area. The Employer finds himself in the same position as to wages whether he hires Mexicans or Americans. In the face of his contract of guaranty with the United States,[9] Morris cannot find in the statute or its amendments any Congressional purpose to make posting a condition precedent.

Perhaps the strongest indication that advance notice of the wage rate was never intended to override the categorical obligations of the Employer is the provision in the international Migrant Labor Agreement[10] and the Standard Work Contract[11] that the wage guaranteed to the Mexican Worker is that prevailing wage paid to domestic workers *at the time the work is performed.* Even

---

8. "In each of the Migratory Stations of Mexico and in each of the Reception Centers of the United States there shall be fixed, in prominent places, bulletins in which are specified the prevailing wage rates for each type of employment in each area of employment in which Mexican Workers from the respective Migratory Stations and Reception Centers will be employed in order that these wage rates may be known in advance by the Mexican Workers who, in any event, may discuss them with the Employers and accept or reject them. * * *"

9. Note 4, supra.

10. Article 15. "The Mexican Consuls and the Representatives of the Secretary of Labor shall exercise vigilance to insure that the wage rate paid to the Mexican Worker is not less than the prevailing wage rate for similar work in the area of employment and that wages are paid to the Mexican Workers in accordance with such rate *or with any increases* in such rate *which may become effective* in the area *during the period of employment,* but not below the minimum rate specified in the Work Contract. *Increases in prevailing wage rates shall be put into effect immediately* by the Employer and *shall not be contingent upon a formal request* to do so by the Mexican Worker, the Consul of Mexico, or the Representative of the Secretary of Labor. Declines in prevailing wage rates shall be recognized and accepted by the Mexican Worker, provided they do not fall below the rates specified in the Work contract." (Emphasis supplied.)

11. See text at note 5, supra.

if there had been a posted "prevailing wage" at the time these Braceros were hired, or at any time during the period of their employment, it was continually subject to change [12] upon proper determination by the Secretary of Labor so that the labor market might not be depressed by the utilization of Mexican labor. Having bound himself to these provisions by his agreement with the United States and the individual employees, Morris, somewhat like the householder in the parable (Matthew 20: 1–16), has done with his own as he would and must now pay his laborers at the same rate that all others currently receive, even those subsequently employed.

 Rejection of Morris' contention on this first ground is not, he asserts, decisive. This is because, so he contends, the Secretary's determination that Morris failed to pay the prevailing wage, to be final and binding, has to be made in accordance with the standards prescribed. One requirement is that the Joint Determination shall be concluded within ten days, and since twenty-three days were used, the decision came too late and was a nullity.

The statutorily authorized international Migrant Labor Agreement (Art. 30) establishes a procedure which works like this: either an Employer or a Mexican Worker (or Mexican Consul in his behalf) may make a complaint of violation. The American Employer makes such complaint to the Representative of the Secretary of Labor. The Mexican Worker, direct or through the Mexican Consul, makes such complaint to the Representative of the Secretary of Labor. Once a complaint is initiated, or a possible violation disclosed by inspection, the Representative of the Secretary of Labor is to make a preliminary investigation to ascertain the facts. If the Representative of the Secretary of Labor, on preliminary investigation,

finds that a violation has occurred and the party in default fails or declines to comply with the request for corrective action, he shall then immediately advise the appropriate Mexican Consul. The Mexican Consul may then request a Joint Investigation. If "the Mexican Consul so requests, the Representative of the Secretary of Labor shall promptly join him in making such investigation."

It is at this point in the procedure that we encounter the crucial provision. For Art. 30(d) provides as to such Joint Determinations:

"All investigations and determinations by the Representative of the Secretary of Labor and the Mexican Consul, as specified in this Article, shall be completed not later than ten days after receipt by the Representative of the Secretary of Labor of the complaint or other information as to the alleged violation."

The procedure then goes on to prescribe that if either party is dissatisfied with the Joint Determination made under Art. 30(d), he may appeal from such determination by giving written notice of his objection within five days after receipt thereof by him. If the notice is given, the record is then referred to the Secretary of Labor, and a Representative of the Mexican Government in Washington who shall make a final joint determination which, by express terms of the Employment Contract (Clause 21), is absolutely binding on the Employer and Mexican Worker.

The preliminary investigation was made here on February 2, 1956. The investigation report was submitted on February 6. Subsequently, a Representative of the Secretary of Labor and the Mexican Consul at Amarillo, Texas, made Joint Findings and a Determination that Morris had failed to pay the prevailing wage to the eight laborers.

12. Nor was the Employer free to terminate employment if the adjusted prevailing wage was unsatisfactory. The Migrant Labor Agreement, Art. 16, and Clause 10 of the Standard Work Contract compelled the Employer to pay the Mexican Worker three-fourths of the wages he would have earned during the contract period (here prescribed as Sept. 29 to Nov. 11, 1955).

This Joint Determination was not made until February 25, 1956, twenty-three days after initial investigation.

Morris' attack on this, while decisively successful below, is really an oblique one. To escape the obvious obstacle of a failure to exhaust his administrative remedies by an appeal within five days from the date of his admitted receipt of the formal written demand for compliance dated March 30, 1956, Morris contended that such step was unnecessary since the whole determination fell for want of a timely completion.

Quite naturally Morris emphasizes the plain words of the Migrant Labor Agreement expressed in the more positive terms of "shall be completed." But the use of "shall" does not foreclose inquiry. Once that is made, we do not think that a fair construction of the international Migrant Labor Agreement, in the light of the purposes to be achieved, meant that action timely begun was thereafter to become a nullity if not *completed* within ten days.

This procedure for joint determination covered many areas of possible controversy[13] in addition to this simpler question of the actual wage paid in comparison to the administratively determined "prevailing wage." With workers scattered over the wide geographical area of this agricultural employment, the scheme of adjustment calling for adjudication by the two sovereigns through selected representatives, each of whom had other governmental duties to perform, and the nature of potential disputes comprising many of substantial complexity and controversy, it is not reasonable to believe that these two Governments intended, by this language, to establish a procedural remedy that would fail altogether for any case, no matter how serious or aggravated, which was incapable of resolution within ten days. On the contrary, these considerations suggest strongly that the ten-day limitation was directory, not mandatory, and prescribed out of recognition that two independent sovereigns with no coercive sanctions available were pledging each other to handle these complaint proceedings with dispatch, that neither would needlessly delay them, and as a specific target, the period of ten days would normally be sufficient.

Whether construed as a statute, or a treaty, or a statutorily authorized contract we discern no intention to adhere to literalism. It is not decisive and must give way to the purpose otherwise so clearly revealed. United States v. American Trucking Association, Inc., 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Florida Citrus Exchange v. Folsom, 5 Cir., 246 F.2d 850, 857; Fulford v. Forman, 5 Cir., 245 F.2d 145; Vaughan v. John C. Winston Co., 10 Cir., 83 F.2d 370, 372; Chisholm v. Bewley Mills, Tex., 287 S.W.2d 943, 945.

We need not here determine whether like considerations would ultimately prevail as to the time (5 days) in which an appeal to Washington (Art. 30(f)) shall be taken. Here Morris never took any appeal and had made no effort to do so either up to the time of the filing of the Government's suit, October 4, 1956, or at any time since then. This means then that all matters involved in or related to the Joint Determination made February 25, 1956 have become final.

Accordingly, the summary judgment rendered below in favor of Morris is reversed and rendered in favor of the Government, and the cause is remanded to the District Court for further and not inconsistent proceedings.

Reversed, rendered and remanded.

---

13. These included such diverse problems as working and living conditions (Clauses 2, 5, 8 and 10 of the Standard Work Contract), workers' representation (Art. 21), abandonment of a work contract by the employee (Art. 20), transportation of the workers (Art. 6), the maintenance of adequate records and statements of work and earnings (Art. 18), and the like.