**BAYOU DES FAMILLES DEVELOP-
MENT CORPORATION, Plaintiff,**

v.

**UNITED STATES CORPS OF ENGI-
NEERS, United States Department of
the Interior, and United States of Amer-
ica, Defendants.**

**Civ. A. No. 79–4324.**

United States District Court,
E. D. Louisiana.

April 20, 1982.

Moise S. Steeg, Jr., Robert M. Steeg, Carl J. Schumacher, Jr., New Orleans, La., for plaintiff.

Elizabeth Stein, Dept. of Justice, Washington, D. C., William F. Baity, Asst. U. S. Atty., New Orleans, La., for defendants.

CASSIBRY, District Judge:

Plaintiff seeks declaratory and injunctive relief from actions by the federal government which have prevented plaintiff from developing its property. Trial in this matter was held before the court without a jury in October 1981. After considering the pleadings, the voluminous administrative record, the testimony of the witnesses, the documents in evidence, and the law applicable to this case, the court finds in favor of the federal defendants on all claims.

## FACTS

Plaintiff Bayou des Familles Development Corporation ("BDF") was formed in August 1972 as a real estate investment venture by several persons who planned to develop and sell approximately 2,000 acres of land located on the West Bank of the Mississippi River in Jefferson Parish, about halfway between New Orleans and Barataria, Louisiana. Much of the property is cypress-tupelo gum swamp and marsh. BDF's development plan called for the excavation of a canal and construction of a levee and pumping station to drain the area. Portions of the property were to be filled for streets and construction of residences and other structures. The plan called for the blocking of Kenta Canal, a man-made waterway which extends into the subject property and connects at its southerly end with Bayou Barataria, a segment of the Gulf Intracoastal Waterway. The development plan also called for the blocking of Bayou Boeuf, a natural waterway that connects through the Bayou Segnette Waterway to the Gulf Intracoastal Waterway. Both Kenta Canal and Bayou Boeuf have direct hydraulic connections to the Gulf of Mexico and are subject to tidal influence.

The U. S. Army Corps of Engineers ("the Corps") has been involved in discussions concerning the possible construction of a hurricane protection levee in the vicinity of plaintiff's property since 1969. BDF designed its levee to follow the contour of one of the several alternative levee lines proposed by the Corps in 1972 for the West Bank flood control and hurricane protection project.

The federal laws authorizing construction of flood control projects require local assurances of cooperation, hold harmless agreements, and often require some local funding. 33 U.S.C. §§ 701c, 701f. While consultation with appropriate local authorities is important, the sole authority and responsibility for preparing a report recommending a specific project to Congress for approval and funding rests with the Corps. 33 U.S.C. § 701a–1.

BDF obtained the necessary permits from Jefferson Parish for construction of its levee and pumping station. In July 1973, BDF entered into a contract for the construction of a pumping station and sewage treatment plant. On August 16, 1973, BDF entered into a contract for the construction of a levee. The plans for the levee included the digging of a canal to the west of the levee line for fill and transportation of materials and equipment. Construction of the levee and canal system began in August 1973.

On August 21, 1973, Raymond Condon, Director of the Department of Drainage and Sewerage for Jefferson Parish, wrote a letter to Roy Farmer, an employee of the Corps of Engineers Planning Division, which referred to the BDF levee. The letter forwarded information about the specifications of the BDF levee pursuant to a request from the Federal Insurance Administration, Department of Housing and Urban Development. Mr. Farmer advised him that such a levee would meet certain Corps hurricane protection requirements.

The Planning Division of the Corps' New Orleans District ("NOD") has no authority over permitting or regulatory functions. That authority rests with the Permit and Statistics Branch, Operations Division, NOD, which first became aware of BDF's unauthorized dredge and fill work when review was requested of a report dated October 9, 1973. That report was being forwarded to the office of the Chief Engineer by the Planning Division and concerned reevaluation of base flood elevations for the Harvey Drainage Area in Jefferson Parish.

On October 10, 1973, the District Engineer wrote to Mr. Condon that the levee planned for the Bayou des Familles area might be constructed, in part, in wetlands that were navigable waters of the United States, and requested Mr. Condon to furnish the name of the developer or contractor who was constructing the levee. On October 18, 1973, Mr. Condon advised the Corps to contact Wilson Abraham. A certified letter was sent the same day to Mr. Abraham, one of the BDF investors and developers, advising that work on the levee should cease immediately pending a determination as to whether a permit was required.

On October 20, 1973, a letter from the District Engineer was forwarded to BDF advising that its levee construction might require a permit based on the definition of navigable waterways published in the Federal Register on September 9, 1972, and that BDF should supply necessary information for use in determining whether a permit was in fact needed. Moise Steeg replied by letter dated November 8, 1973, requesting that all future correspondence be directed to him as legal counsel for BDF. Also on November 8, Mr. Abraham wrote to the engineering firm of Harris and Varisco, consulting engineer for the levee project, to comment on progress of the levee. He noted that the levee had sunk in many spots, and that the work was not proceeding as expeditiously as the contractor had committed to the previous month.

In January 1974 the Corps issued a cease and desist order to BDF, having heard nothing further from Mr. Steeg. The Corps informed BDF that it had determined that federal permits were required for construction of the levee and canal, including the closures of Bayou Boeuf and Kenta Canal, based on an on-site inspection of the property by the Corps. The levee was approximately 90% complete at that time.

On March 8, 1974, the District Engineer wrote to BDF to direct it to submit a permit application for dredging and filling already done and for work necessary to complete the project. BDF was advised that an Environmental Impact Statement ("EIS") would have to be prepared before final action could be taken on the permit, due to the potential environmental impact of the proposed project. 42 U.S.C. § 4332(2)(C). On April 4, 1974, BDF suggested to the Corps that by modifying its plans in such a way as not to block Bayou Boeuf, it could avoid Corps jurisdiction entirely. BDF also requested a temporary permit to complete the work already begun. The Corps advised Mr. Steeg that it had no authority to issue a temporary permit. Information before the Corps indicated that Bayou Boeuf had already been blocked.

In February 1975 the United States filed an enforcement action against BDF for violations of Section 10 of the Rivers and Harbors Appropriations Act of 1899 ("RHA"), 33 U.S.C. § 403. *United States of America v. Bayou des Familles Development Corporation*, No. 75–536 (E.D.La.). The proceeding was resolved through entry of a final judgment that required BDF to

pay a civil penalty of $25,000 and to submit an after-the-fact application to the Corps within 60 days for all work already done within the "project area which was done below the elevation of mean high tide." The "project area" was defined as those areas within the project which were under the ownership of BDF on October 17, 1974. The elevation of mean high tide for purposes of the order was specified to be 1.5 feet above mean sea level.

On April 7, 1975, BDF submitted an after-the-fact application for the construction of a levee to enclose approximately 2,000 acres. The Corps issued a public notice of the proposed project on April 28, 1975, including its determination that an EIS was required as part of the permit review process.

A draft EIS was submitted to the Corps, and revised in accordance with the Corps' comments. A public meeting on the draft EIS and proposed project was held on October 23, 1975. Numerous persons, several federal agencies and one state agency expressed objections to the project; some comments in support of the project were also given. The Corps received many letters in opposition to the project after the meeting as well. No responses to the public comments were sent to the Corps by BDF, although ample opportunity for response was provided.

The Corps' deliberations on plaintiff's permit application were influenced by the potential creation of the Jean Lafitte National Historical Park ("the park") in the vicinity of the subject property. Study of the feasibility of such a park had been funded by a specific congressional appropriation in August 1972. P.L. 92–369. On November 10, 1978, the park was established by act of Congress. 16 U.S.C. § 230. The park boundaries encompass part of BDF's property and extend over the levee built by BDF.

The provisions establishing the park call for the designation of a "core area" of approximately 8,000 acres and a "park protection zone" of 12,000 acres to serve as a buffer area between the core area and adjacent developments. P.L. 95–625, 16 U.S.C. § 230a(b). The Secretary of the Interior is authorized to acquire property within the core area, while uses in the park protection zone are to be regulated by local authorities pursuant to guidelines developed by the Secretary of the Interior in consultation with State and local authorities within six months of the enactment of the statute. If the State and local authorities fail to enact or enforce rules regulating uses of properties in the park protection zone, the Secretary of the Interior is authorized to acquire real property interests in lands within the park protection zone to protect the values for which the park was established. *Id.* 16 U.S.C. § 230a(e). Numerous local agencies are involved in developing the guidelines; progress has been slow. To date, the Jefferson Parish Council has not approved the proposed guidelines. Over 1000 acres of BDF's property lies in the park protection zone.

On January 28, 1980, the Department of the Interior ("DOI"), through the National Park Service, informed BDF that DOI proposed to acquire a 151 acre tract for inclusion in the core area of the park. DOI has acquired more than 2200 acres in the core area, but has not yet begun negotiations with BDF for acquisition of its 151 acre tract. At the date of trial, funding for such acquisition was very uncertain.

Another influence on the Corps' processing of BDF's permit application was the continuing uncertainty about the placement of the West Bank flood control and hurricane protection levee. In May 1978 the Corps presented a number of proposals for the hurricane levee placement to the Jefferson Parish Council. Only one of the proposals presented to the Council followed the alignment of the BDF levee. In making the proposals, the Corps took into account the potential creation of the park, later realized in November 1978.

On September 17, 1979, the District Engineer wrote to the President of the Jefferson Parish Council to inform him of the Corps' decision to recommend to Congress a levee alignment which followed the park boundaries rather than the BDF levee line. The

levee alignment proposed by the Corps would generally provide protection to areas of the West Bank that have already been developed. The majority of the subject property, however, lies outside of the area that would be protected under the Corps' proposal. In developing the proposal, the Corps considered, among other factors, the potential impacts any hurricane levee would have on the newly-created park and upon the uses and values to be served and protected by the park.

Because the Corps has not yet received the necessary local assurances, the Corps has been unable to submit a final recommendation regarding the levee alignment to Congress for approval. Congressional approval and appropriations must be obtained before design and construction of the levee may begin. 33 U.S.C. § 701c.

Finally, after almost four years of deliberations and intervening events, on September 17, 1979, the Corps denied BDF's application for an after-the-fact permit. The District Engineer articulated the basis for his decision:

> I find that denial of the Department of the Army after-the-fact permit prescribed by regulations published in 33 C.F.R. 320 through 329 to Bayou Des Familles Development Corporation is based on thorough analysis and evaluation of the various factors enumerated above; that there are reasonable alternatives available that will achieve the purposes for which the work is being constructed; that the proposed work is not in accordance with the overall desires of the public as reflected in the comments of state, Federal, and local agencies and the general public; that the proposed work does not comply with established State and local laws regulations and codes; that there have been identified significant adverse environmental effects related to the work; that the denial of this permit is consonant with national policy, statutes, and administrative directives; and that on balance the total public interest should best be served by the denial of

a Department of the Army after-the-fact permit to Bayou Des Familles Development Corporation.

The Corps specifically considered the anticipated flood control benefits that would likely result from the project as well as the statements of officials of Jefferson Parish and others who favored the project. However, in weighing these benefits against the expected adverse environmental impacts of the work, the District Engineer concluded that the detriments outweighed the benefits.

On November 2, 1979, the instant action was filed by BDF against the Corps, DOI and the United States.[1] BDF seeks to enjoin the Corps' denial of its permit application, claiming that the Corps lacked jurisdiction over the subject property in 1973, and in the alternative, that the Corps failed to give proper weight to the flood protection provided by BDF's levee in denying the permit. Plaintiff also seeks to enjoin the Corps' recommendation of a levee alignment other than one following its own levee line. Finally, plaintiff seeks to enjoin DOI from issuing regulations covering the park protection zone beyond the six-month period specified in the park's authorization statute, and to enjoin DOI from including its property in the park's core area without providing funding for its acquisition.

## CORPS' JURISDICTION UNDER THE RHA

Plaintiff claims that the Corps' actions should be invalidated because the Corps erred in asserting its jurisdiction over the levee project under Section 10 of the Rivers and Harbors Appropriations Act of 1899 ("RHA"), 33 U.S.C. § 403. The RHA prohibits any activity affecting the course, condition, location or capacity of any navigable water unless authorized by a permit issued by the Corps. Plaintiff contends that its plans did not affect "navigable waters" within the meaning of the statute or the Corps' regulations in effect at the time jurisdiction was asserted.

---

1. Jefferson Parish was originally also named as a defendant, but was subsequently dismissed.

In regulations published on September 9 and 16, 1972, the Corps defined "navigable waters" to extend its regulatory jurisdiction in coastal areas to the line on the shore reached by the plane of the mean (average) high water. 33 C.F.R. § 209.260(k)(1)(ii). The regulations further provided that regulatory jurisdiction extends to the entire surface and bed of all water bodies subject to tidal action even though portions of the water body may be extremely shallow, or obstructed by vegetation. 33 C.F.R. § 209.-260(k)(2). The Corps asserts that federal regulatory jurisdiction under Section 10 existed in 1973 because (1) the plans called for blockage of two tidal waterbodies, Kenta Canal and Bayou Boeuf, and (2) at least some of the marshland on which the levee was built is "navigable in law" because it lies below the plane of mean high water.

■ Judicial precedent recognizes several tests for navigability: (1) ebb and flow of the tide, (2) connection with a continuous interstate waterway,[2] (3) navigable capacity, and (4) navigable in fact. *United States v. DeFelice*, 641 F.2d 1169 (5th Cir.) *cert. denied,* —— U.S. ——, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981), citing *Kaiser Aetna v. United States*, 444 U.S. 164, 170–172, 100 S.Ct. 383, 387–389, 62 L.Ed.2d 332 (1979). The ebb and flow test in this case establishes the Corps' jurisdiction over plaintiff's levee construction under Section 10.

■ Evidence before the Corps in 1973, and evidence presented at trial to this court, show that both Kenta Canal and Bayou Boeuf have a direct hydrological connection to the Gulf of Mexico through connecting canals, bayous, lakes, and Barataria Bay. Plaintiff's expert at trial admitted that both waterways are subject to tidal influence, experiencing a range of tide[3] of approximately 0.2 feet. For the purpose of establishing federal regulatory jurisdiction, the amount of tidal influence is irrelevant as long as a waterbody is in fact subject to the ebb and flow of the tide.

■ Bayou Boeuf, a natural waterway subject to tidal influence, is "navigable" for purposes of Section 10 jurisdiction. See *United States v. Lewis*, 355 F.Supp. 1132 (S.D.Ga.1973); *United States v. Cannon*, 363 F.Supp. 1045 (D.Del.1973); *United States v. Holland*, 373 F.Supp. 665 (M.D.Fla. 1974); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir. 1978). Plaintiff's failure to obtain a permit prior to blocking Bayou Boeuf constituted a violation of Section 10 of the RHA.

■ Plaintiff continued to rely on the opinion of the Corps' District Counsel, later overturned by the Washington, D.C. office, that although Kenta Canal was tidal, as an artificial canal opened only at one end, it was not "navigable". The opinion of the District Counsel, subject to internal agency review, was not binding on the Corps. An agency may adjust its policies and rulings in the light of its experience. *Creppel v. U. S. Army Corps of Engineers*, 670 F.2d 564 (5th Cir. 1982).

■ *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir. 1974), is dispositive. In *Stoeco* the court held that once artificial water bodies are connected to tidal water bodies, they become "navigable waters of the United States" by operation of law. *Stoeco*, 498 F.2d at 611. This holding was followed by the Fifth Circuit in *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976), where the Corps' jurisdiction was upheld over five canals connecting to a tidal water body, and in *United States v. DeFelice, supra,* where jurisdiction was upheld over construction of a dam across an artificial, privately owned canal, subject to tidal influence. This court finds that the Corps' assertion of jurisdiction over any obstruction of Kenta Canal, a tidal water body when the 1972 regulations were issued, was proper. Plaintiff's failure to obtain a permit prior to plugging Kenta

---

**2.** "Tidal waters by their very nature form a continuous water body with interstate waterways." *DeFelice*, 641 F.2d at 1175.

**3.** "Range of tide" is the difference between mean high tide and mean low tide.

Canal constituted a violation of Section 10 of the RHA.[4]

■ The Corps also asserts jurisdiction under the RHA over marshlands on the subject property which are inundated by mean high tide. 33 C.F.R. § 209.-260(k)(1)(ii). Mean high tide is defined as the average of all high tides in a specific area measured over a lunar cycle of 18.6 years. *Id.* Construction of a levee and canal system on tidal marshes, or construction of a levee which obstructs the ebb and flow of the tide over tidal marshes, is subject to the permit requirements of Section 10 of the RHA. *Stoeco,* 498 F.2d at 611.

In October 1970 the Corps performed surveys of the subject property to establish its ground level elevation in conjunction with the federal flood insurance program. This survey showed that the surface elevations of the subject property near Louisiana State Highway 45, on the eastern boundary of the property, are about three feet above mean sea level, or three feet National Geodetic Vertical Datum ("NGVD"). NGVD is referenced to the 1929 datum, a standard plane against which elevations are established, and is simply the zero point for referencing surface elevation. The elevation steadily drops as one proceeds west from Louisiana State Highway 45 until at a distance of about 2,000 feet west of the road, the surface elevation is approximately 0.0 feet NGVD to –0.2 feet NGVD.

In 1974 the Corps calculated the level of mean high tide on the subject property to be 1.5 feet above NGVD. This level of mean high tide in areas of elevation of 1.5 feet NGVD and less indicates that the area is "navigable" under the Corps' regulations.

In 1978 the Corps discovered that the calculation of mean high tide on subject property was too high. In 1980 the tide gauge at Barataria Station, upon which the

Corps had relied in calculating mean high tide to be 1.5 NGVD, was adjusted by 0.65 feet. Taking the original calculation of mean high tide at 1.5 feet and correcting for the error in the gauge by subtracting 0.65 feet, the corrected mean high tide value at the subject property is 0.85 feet above NGVD. The corrected value also indicates that the area is tidally washed.

■ Federal defendants claim that plaintiff may not ask the court to invalidate the assertion of Section 10 jurisdiction based on information never submitted to the agency. Plaintiff's expert testified at trial that he knew the Corps' tide gauge must be inaccurate, but BDF never so informed the Corps. Without deciding the issue of whether the court in this case should consider the gauge inaccuracy in evaluating the propriety of the Corps' actions, *see Doyle v. United States,* 599 F.2d 984, 1000–1001, *amended In re Doyle,* 609 F.2d 990 (Ct.Cl.1979); *D.C. Transit System v. WMATA,* 466 F.2d 394, 413–414, (D.C.Cir.1972), I find that the inaccuracy makes no difference in the outcome. Whether mean high tide is assumed to be 1.5 feet NGVD or 0.85 feet NGVD, the subject property is inundated at mean high tide.

At trial plaintiff's expert, the consulting engineer for the BDF project, testified that mean high water did not inundate the subject property. In his calculations, he relied on Coast and Geodetic survey navigation charts published by the National Ocean Survey, referenced to mean low water, rather than to NGVD. It is standard practice to refer to local tide gauges to determine whether mean high tide inundates property at a given surface elevation NGVD. The Corps calculated the level of mean high tide on the subject property by using tide gauge readings from the gauge closest to the area at Barataria Station, a few miles away. Plaintiff's expert did not

---

4. Evidence was presented by the federal defendants that Kenta Canal meets other tests of navigability as well. Past use in interstate commerce is suggested by evidence of cypress logging activity on Kenta Canal, but not conclusively proved. Navigable capacity under *United States v. Appalachian Power Co.,* 311

U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940) (commerce could be made possible with artificial aid), was also suggested. In light of the tidal nature of Kenta Canal, there is no need for this court to assess the sufficiency of such evidence.

rely on local tide gauges to reference the mean low tide data to NGVD. I find that the procedure used by plaintiff's expert does not yield reliable results.

Evidence presented at trial by defendants' expert in wetlands ecology and identification, Dr. R. Terry Huffman, adds further support to the finding that the area in question is tidally washed. After visiting twelve sites along the western and southern portions of the property on October 18, 1981, he testified that the soil and water in the area have a salty taste, indicating some type of tidal flushing. Watermarks and bright green duckweed on trees four inches above the water line in some channels suggest tidal fluctuation in the area. Vegetation found on the property is consistent with slightly brackish swamp or marsh. Dr. Huffman observed stunted cypress trees and the absence of juvenile regeneration at several sites, and concluded that saltwater intrusion was causing these conditions. The area is hydrologically connected with waterways that connect with the Gulf of Mexico. Dr. Huffman testified that the dikes of channels in the area are breached, permitting an uninterrupted flow of water onto the subject property, and that there is evidence of ebb and flow of water in the breaches. With the exception of the site visited near the pumping station at the southeastern extremity of the property, Dr. Huffman found the area to be subject to tidal influence.

I find that the Corps' assertion of jurisdiction over any obstruction of the tidal marshes on subject property under Section 10 of the RHA was proper. Plaintiff's failure to obtain a permit prior to constructing a levee and canal system on tidal marshland constituted a violation of federal law. 33 U.S.C. § 403.

### CORPS' JURISDICTION UNDER THE FWPCA

On October 18, 1972, the Federal Water Pollution Control Act Amendments ("FWPCA") were enacted. 33 U.S.C. § 1251 et seq. (renamed Clean Water Act in 1977). Section 301(a) of the FWPCA, 33 U.S.C. § 1311(a), prohibits discharges of pollutants into the navigable waters except as authorized by permit. The Corps first proposed "interim guidance" regulating discharges of dredged or fill material into the navigable waters pursuant to Section 404 of the FWPCA on May 10, 1973 (38 Fed.Reg. 12217). The Corps issued final Section 404 regulations on April 4, 1974 (39 Fed.Reg. 12119). Any discharge of pollutants into navigable waters, except in compliance with the FWPCA, is prohibited. 33 U.S.C. § 1311(a). "Navigable waters" are defined as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The Corps' regulatory jurisdiction under the FWPCA is broader than its jurisdiction under the RHA. *Leslie Salt*, 578 F.2d at 754–755 (9th Cir. 1978); *Natural Resources Defense Council v. Callaway*, 392 F.Supp. 685 (D.D.C.1975). Under the FWPCA, the Corps has the right to control the disposal of dredged material upon freshwater as well as tidal wetlands. *American Dredging Co. v. Dutchyshyn*, 480 F.Supp. 957 (E.D. Pa.), *aff'd*, 614 F.2d 769 (3d Cir. 1979).

It is evident from the legislative history of the Clean Water Act of 1977 that Congress was aware of the Corps' interpretation of Section 404, and approved of it. The Senate Environment and Public Works Committee, in commenting on the Senate bill, stated:

Section 404 of the Federal Water Pollution Control Act Amendments of 1972 required a permit program to control the adverse effects caused by point source discharges of dredged or fill material into the navigable waters including: (1) the destruction and degradation of aquatic resources that results from replacing water with dredged material or fill material; and (2) the contamination of water resources with dredged or fill material that contains toxic substances.

The committee amendment is designed to reaffirm this intent and dispel the *wide-spread fears that the program is regulating activities that were not intended to be regulated.*

S.Rep.No. 95–370, 95th Cong., 1st Sess. (1977), at 74–75, reprinted in [1977] U.S. Code Cong. & Ad. News 4326, 4399–4400 (emphasis added).

The permit program established under Section 404 of the Federal Water Pollution Control Act Amendments of 1972 was intended to control the degradation of aquatic resources that results from any replacement of water with fill material, as well as the degradation that results from the discharge of dredged or fill material which contains toxic substances. See S.Rep.No. 95–370, supra. 33 U.S.C. § 1362(6).

On July 19, 1977, the Corps promulgated final regulations implementing the permit programs under Section 10 of the RHA and Section 404 of the FWPCA. 42 Fed.Reg. 37122, codified at 33 C.F.R. § 320–329. These regulations superseded the September 1972 Corps definition of navigable waters of the United States. They also superseded the July 25, 1975, interim final regulations, 40 Fed.Reg. 31320, promulgated in response to NRDC v. Callaway, supra, which invalidated the Corps 1974 regulations implementing the Section 404 permitting program insofar as they purported to limit federal permitting jurisdiction to traditionally navigable waters. These July 1977 regulations clarified the definition of navigable waters of the United States to conform with the Corps' practice relating to permit processing. Wetlands are defined in the 1977 regulations as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 323.2(c). This definition is substantively the same as the July 1975 definition. 33 C.F.R. § 209.120(d)(2) (1976).

The area in question, with the exception of some of the ridge area along Louisiana State Highway 45, is a wetland within the regulatory definition of that term.[5]

■ The discharges of fill into the tidal wetlands in question and the discharges of dredged or fill material to dam Bayou Boeuf and Kenta Canal as part of plaintiff's levee project construction constituted discharges of pollutants into the navigable waters within the meaning of the FWPCA.

■ In October 1973 when the Corps' permitting authorities became aware of plaintiff's levee and canal construction activities, the Corps had the authority under the FWPCA to require plaintiff to apply for a permit. Furthermore, the Corps properly determined that the discharges of fill into the wetland area in question and into Bayou Boeuf and Kenta Canal were subject to federal jurisdiction under the FWPCA as well as under the RHA. Plaintiff's failure

---

5. As I have already found, defendants' expert in wetlands ecology and identification, Dr. R. Terry Huffman, visited 12 sites chosen as representative of types of topographic relief, habitat, and vegetative cover that are indicative of the overall environmental characteristics of the area in question. In almost all sites visited, Dr. Huffman, based on his education, experience, and observations, found indications of wetland hydrology, wetland soil conditions and wetland vegetation.

The soil at most of the sites visited is saturated with water. The soil is peaty, organic, mucky, and very black. The vegetation is characteristically that of wetlands, with areas of marsh containing cattails, arrowhead, and maiden cane, and areas of cypress tupelo swamp complex and floating shrub swamp with bayberry and red maple. Dr. Huffman found standing water in some areas, which after consulting with the National Weather Service about recent absence of flooding or excessive rainfall in the area, he found to be a further indication of wetland hydrology. Dr. Huffman is trained in remote sensing techniques. His examination of aerial infra-red photographs of the area taken in 1978, 1974, and 1973, together with his on-site investigation, led him to the opinion that the entire area in question, with the exception of the high ridge area, is and has been continuously since at least 1970 a wetland. This court finds that testimony persuasive.

Dr. Huffman's conclusion is supported by the administrative record, the West Bank Soil Survey prepared by the U.S. Soil Conservation Service, and the factual testimony of Calvin Patrick O'Neil and S. Dayton Mathews, both of whom also visited the site. Plaintiff presented no lay or expert evidence to refute Dr. Huffman's conclusion that the area in question is a wetland, and has been one continuously since 1970.

to obtain a permit before commencing construction of its levee and canal system violated federal law. 33 U.S.C. §§ 403, 1311(a), 1344.

## THE 1979 PERMIT APPLICATION DENIAL

The court, having found that the District Engineer acted within the scope of his authority in asserting jurisdiction, next must consider whether the decision to deny the permit was arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law. *Taylor v. District Engineer*, 567 F.2d 1332 (5th Cir. 1976).

■ In reviewing the Corps' permit denial, this court is limited to the administrative record before the Corps at the time it made its decision in September 1979. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

The standard for review of the Corps' denial of plaintiff's permit application is that provided in the Administrative Procedure Act, 5 U.S.C. § 706. The court's review is not *de novo*. The court is not empowered to substitute its judgment for that of the agency. The reviewing court must determine whether the agency considered all relevant factors, but may not reweigh the evidence. *Id.*

The July 1977 Corps regulations implementing the RHA Section 10 and the FWPCA Section 404 permit programs retain the requirement set forth in previous regulations that all applications for permits to conduct activities affecting waters of the United States be subject to a public interest review. 33 C.F.R. § 320. The factors to be

considered include conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production and the general welfare. The regulations state that no permit will be granted unless it is found to be in the public interest. 33 C.F.R. § 320.4(a). Further, the regulations require the Corps to evaluate the effects of a proposed project on wetlands and state that unnecessary alteration or destruction of wetlands should be discouraged. 33 C.F.R. § 320.4(b). Proposed projects must also be evaluated with regard to their potential impact on fish and wildlife, 33 C.F.R. § 320.4(c), and upon water quality, 33 C.F.R. § 320.4(d).

The 1977 Corps regulations require the Corps to use the following criteria in evaluating permit applications:

(i) the relative extent of the public and private need for the proposed structure or work;

(ii) the desirability of using appropriate alternative locations and methods to accomplish the objective of the proposed structure or work;

(iii) the extent and permanence of the beneficial and/or detrimental effects with the proposed structure or work may have on the public and private uses to which the area is suited; and

(iv) the probable impact of each proposal in relation to the cumulative effect created by other existing and anticipated structures or work in the general area. 33 C.F.R. § 320.4(a)(2).[6]

The Corps' evaluation of Section 404 permit applications must also take into account

---

6. The Corps is also required to consider the effect on wetlands that would result from the proposed project.

(b) Effect on wetlands. (1) Wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest

(2) Wetlands considered to perform functions important to the public interest include:

(i) Wetlands which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species;

(ii) Wetlands set aside for study of the aquatic environment or as sanctuaries or refuges;

(iii) Wetlands, the destruction or alteration of which would affect detrimentally natural drainage characteristics, sedimentation pat-

the criteria incorporated into guidelines established by the Environmental Protection Agency ("EPA") pursuant to Section 404(b) of the FWPCA. *See* 40 C.F.R. § 230 (40 Fed.Reg. 41293, September 5, 1975). The EPA § 404(b) guidelines establish criteria for evaluating the water quality impacts of proposed projects.

The Corps evaluated the public comments, the comments of governmental agencies, the data generated by the Corps, and the data presented by BDF and its consultants in reviewing BDF's application. Of key concern to the Corps were the comments from the public and from other federal agencies relating to the environmental effects of the proposed work.

The area in question provides for water filtration, assists in maintaining the salinity regime for the Barataria Basin, provides habitat for terrestrial and aquatic fauna, and provides significant detritus export vital to the maintenance and health of Louisiana Gulf fisheries.

Development of the area in question and the destruction of almost 2,000 acres of wetlands would result in the loss of wildlife habitat, the loss of water purification and filtration benefits, and have significant adverse impacts on the Barataria Bay fisheries resources due to loss of detritus contribution and habitat. After evaluating the above factors and weighing the public need against the private need for the project, as required by Corps' regulations, the District Engineer concluded that the proposed work would not be in the public interest.

Based on the evidence in the administrative record before the Corps at the time it denied plaintiff's permit application on September 17, 1979, the Corps' decision was not arbitrary or capricious, an abuse of discretion, nor otherwise not in accordance with law. The Corps considered all relevant factors. The Corps was required by regulations to consider not only the flood protection aspects of the proposed project but other factors, including water dependence of the project and ecological consequences, effect on wetlands water quality, and effects on fish and wildlife habitat. 33 C.F.R. § 320.4. The Corps may properly deny a permit on ecological grounds. *Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971).

---

terns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

(iv) Wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs and bars;

(v) Wetlands which serve as valuable storage areas for storm and flood waters;

(vi) Wetlands which are prime natural recharge areas. Prime recharge areas are locations where surface and ground water are directly interconnected; and

(vii) Wetlands through natural water filtration processes serve to purify water.

(3) Although a particular alteration of wetlands may constitute a minor change, the cumulative effect of numerous such piecemeal changes often results in a major impairment of the wetland resources. Thus, the particular wetland site for which an application is made will be evaluated with the recognition that it is part of a complete and interrelated wetland area. In addition, the District Engineer may undertake reviews of particular wetland areas in consultation with the appropriate Regional Director of the Fish and Wildlife Service, the Regional Director of the National Marine Fisheries Service of the National Oceanic and Atmospheric Administration, the Regional Administrator of the Environmental Protection Agency, the local representative of the Soil Conservation Service of the Department of Agriculture, and the head of the appropriate State agency to assess the cumulative effect of activities in such areas.

(4) No permit will be granted to work in wetlands identified as important by subparagraph (2), above, unless the District Engineer concludes, on the basis of the analysis required in paragraph (a), above, that the benefits of the proposed alteration outweigh the damage to the wetlands resource and the proposed alteration is necessary to realize those benefits. *In evaluating whether a particular alteration is necessary, the District Engineer shall consider whether the proposed activity is primarily dependent on being located in, or in close proximity to the aquatic environment and whether feasible alternative sites are available.* The applicant must provide sufficient information on the need to locate the proposed activity in the wetland and must provide data on the basis of which the availability of feasible alternative sites can be evaluated.

33 C.F.R. § 320.4(b) (emphasis added).

The court concludes that as a matter of law, plaintiff is not entitled to "credit" for its previous illegal levee and canal construction as a factor in evaluating the 1975 permit application. When a developer proceeds with dredging operations without permission, it does so at its own peril. *Weiszmann v. District Engineer*, 526 F.2d 1302, 1305 (5th Cir. 1976); *United States v. Lewis*, 355 F.Supp. 1132, 1141 (S.D.Ga.1973); *United States v. Sunset Cove, Inc.*, 514 F.2d 1089, 1090 (9th Cir. 1975). The Corps notified plaintiff to cease its dredge and fill operation as soon as the permitting branch became aware of the work. BDF did not wait for a final determination of navigability before proceeding with its operations. Once a final determination was made, BDF continued to assert that a permit was not necessary, submitting its application only when required to do so by the 1975 consent order. Such "self-help for the impatient" cannot circumvent enforcement of the Corps' statutory mandates. *United States v. Joseph G. Moretti*, 478 F.2d 418, 427 (5th Cir. 1973); *Weiszmann v. District Engineer*, 526 F.2d at 1305.

Nothing in the evidence presented at trial by plaintiffs suggests to the court that the decision to deny the permit was based on less than a full investigation of conditions and application of the relevant statutes to the facts adduced by the Corps.

## CONSTITUTIONAL CLAIMS

Plaintiff has raised a plethora of procedural due process claims, most of which can easily be disposed of. These claims relate to the constitutionality of the Corps' regulations under the RHA and the FWPCA, the delay in processing BDF's permit application, the failure of the DOI to promulgate guidelines for the park protection zone and its authority to act in the future, the failure of Congress to appropriate funds for the acquisition of the subject property within the core area of the park, and the Corps' failure to recommend a West Bank hurricane levee placement in line with plaintiff's desires. Each issue will be discussed in turn, bearing in mind that the

contemporaneous construction of an agency of a regulation it is charged with administering is entitled to deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Further, where an agency's interpretation of its own regulation is reasonable, it must stand even though it may not appear as reasonable as some other interpretation. *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1208–9 reh. denied, 633 F.2d 582 (5th Cir. 1980). Agency action is entitled to a presumption of validity, *Ethyl Corp. v. EPA*, 541 F.2d 1 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 349 (1976), and statutes are presumptively valid. *Port Const. Co. v. Government of the Virgin Islands*, 359 F.2d 663 (3d Cir. 1966).

### The Permit Proceedings

Arguments concerning the unconstitutionality of the Corps' application of Section 10 and Section 404 in this case are without merit. The Congressional mandate that plaintiff apply for a permit before constructing a levee on wetlands below mean high tide is a valid exercise of the constitutional Commerce Clause power. *Zabel v. Tabb*, 430 F.2d 199, 203–206 (5th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971) (holding that the RHA is constitutional); *United States v. Byrd*, 609 F.2d 1204 (7th Cir. 1979) (holding that the FWPCA is constitutional under the Commerce Clause); *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181 (D.Ariz.1975) (holding that the FWPCA is not unconstitutionally vague, that it does not violate ex post facto principles because of alleged uncertainty as to the extent of jurisdiction, and that the commerce power extends to control water pollution in all waters).

The regulations governing the issuance of permits under Section 10 and Section 404 are not unconstitutionally vague. They specify the applicable procedures, the criteria for the public interest review, and the factors that the Corps must consider. 33 C.F.R. §§ 320–329. Further guidance is provided by the Environmental Protection

Agency's § 404(b) guidelines. The record shows that all of the elements required to be considered by the regulations were evaluated by the Corps; the weight to be assigned each factor is properly left to the discretion of the agency. The regulations are reasonable and consistent with the intent of Congress. *Leslie Salt Co. v. Froehlke, supra.*

 Absent proof of invidious arbitrary discrimination, plaintiff's charge of selective prosecution cannot be sustained. *United States v. Hercules, Inc.*, 335 F.Supp. 102 (D.Kan.1971). No such proof has been offered. In cases such as this, the United States has broad prosecutorial discretion. *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977).

 The long delay between the submission of plaintiff's permit application and the Corps' ruling in 1979, while unfortunate, does not rise to the level of a denial of due process. The Corps' consideration of the impact of possible effluent from plaintiff's proposed sewage treatment plant on the park, and respect for the park Administrator's request that a levee not be constructed within the park boundaries, did not exceed the Corps' statutory mandate to consider the environmental effects of the proposed project, *see Zabel v. Tabb*, 430 F.2d at 209–214, although consideration of those factors may have slowed the processing of BDF's permit application. In any event, the authority plaintiff cites in requesting that the court enjoin the permit denial, *see, e.g. Deering Milliken, Inc. v. Johnston*, 295 F.2d 856, 861–64 (4th Cir. 1961); *International Association of Machinists & Aerospace Workers v. National Mediation Board*, 425 F.2d 527, 535 n.3 (D.C.Cir.1970), supports judicial intervention only to "compel agency action . . . unreasonably delayed" in accordance with 5 U.S.C. § 706(1), not judicial intervention to invalidate agency action where the agency has acted in an allegedly unreasonable time. *EEOC v. Raymond Metal Products Co.*, 385 F.Supp. 907, 914 (D.Md.1974), *aff'd*, 530 F.2d 590 (4th Cir. 1976), *cited in Potomac Electric Power Co. v. Environmental Protection Agency*, 650 F.2d 509, 510 n.1 (4th Cir. 1981).

*The Park*

As I have said, Jean Lafitte National Historical Park was created by Act of Congress on November 10, 1978. 16 U.S.C. § 230a. The park consists primarily of the 8,000-acre core area, also referred to as the Barataria Marsh Unit, and a 12,000-acre Park Protection Zone. The statute authorizes the Secretary of the Interior to acquire the acreage comprising the core area. As to the park protection zone, uses therein are to be regulated by state and local authorities by regulations that comport with guidelines to be developed by the Secretary of the Interior in consultation with those authorities. Upon failure of local authorities to adopt or enforce regulations the Secretary *may* acquire property interests in the park protection zone to protect the values for which the core area was established. *See* Section 902(e) of the Act.

 The Park Act delegates unlimited authority to acquire property interests in the core area. It is beyond dispute that the United States may take land for federal purposes by eminent domain. *Kohl v. United States*, 91 U.S. 367, 23 L.Ed. 449 (1875); *United States v. Jones*, 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015 (1883); *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893). Thus, the Park Act, as an exercise of that power, is constitutional and there is authority for the Department of the Interior to acquire the 151 acres of the area in question that are within the core area.

As to the park protection zone, the Secretary's powers of condemnation are limited. Section 902(e) of the Park Act, 16 U.S.C. § 230a(e), makes it clear that the Secretary may not acquire property interests in the park protection zone unless state and local authorities fail to enact or enforce regulations for the use of the park protection zone, and with respect to a particular use or area, such failure threatens the core area and the values for which it was created.

The concept of a limited power of condemnation is not new with this statute. It

has been used in other parks. *See, e.g.*, P.L. 90–545, as amended by P.L. 95–250, 16 U.S.C. § 79a *et seq.* [Redwoods National Park]; P.L. 92–400, 16 U.S.C. § 460aa *et seq.* [Sawtooth National Recreation Area].

From a constitutional standpoint, if local authorities regulate in the park protection zone, it is pursuant to the police power. However, no local regulations have yet been enacted; therefore, there is no constitutional issue based on any state police power authority. Any guidelines developed by the Secretary of the Interior for the park protection zone in consultation with State and local authorities would not be an exercise of the police power. Further, they would not themselves prohibit any activities in the park protection zone. Rather, they would provide the criteria pursuant to which the Secretary may exercise the limited power of condemnation in the park protection zone in the event that local regulations are not enacted or enforced. Since it is entirely speculative at this point whether any state or local ordinances will be enacted, and if enacted, how they will affect the area in question, plaintiff's claim is not ripe.

■ Although the Park Act provides for the Secretary of the Interior to develop guidelines in consultation with State and local authorities within six months after enactment of the statute, the court concludes that the six month deadline is not mandatory. *Ralpho v. Bell*, 569 F.2d 607, 626–628, *reh. denied*, 569 F.2d 636 (D.C.Cir. 1977); *United States v. Morris*, 252 F.2d 643, 649 (5th Cir. 1958). The provision is not intended as a limitation on power but rather as a guide for the conduct of orderly procedure, *id.*, and under the circumstances, the Department of the Interior's failure to develop guidelines is excusable. The Department of the Interior is not precluded from continuing its efforts to work with state and local authorities to develop guidelines.

■ As to the 151 acres, a different issue has been presented. Plaintiff alleges that there is a violation of due process where, as here, there has been only an announcement of the intention to condemn,

contingent upon the availability of funds. Funds for acquisition of properties in the core area have been severely limited. In addition, the order or priority of acquisition is a discretionary matter. The slowness of the acquisition process, while perhaps unfortunate, goes neither to the authority of Congress to establish the park nor to the authority of the Department of the Interior to make acquisitions. Where the Department of the Interior has done all it can to implement the statute and its requirements, and where inability to proceed is due to a lack of Congressional authorization or appropriations, it will not be held to have failed to perform the duties imposed by the statute. *Sierra Club v. Department of the Interior*, 424 F.Supp. 172, 175 (N.D.Cal. 1976). The remedy, if any, lies with Congress. *Id.*

In conclusion, the court finds that the statute creating Jean Lafitte National Historical Park is constitutional. The court further finds that the plaintiff has failed to state a claim upon which relief may be granted with respect to the Department of the Interior's implementation of the Park Act.

*The Hurricane Levee*

■ There is no question that the Flood Control Act, 33 U.S.C. § 701, *et seq.*, is valid on its face as an exercise of the Commerce Clause power. Development and construction of flood control projects is clearly a proper activity and is related to federal authority to regulate navigable waters.

■ Plaintiff's claim that the failure to place a flood control levee where plaintiff would like it to be does not create a justiciable case or controversy ripe for review. *Allain-Lebreton Co. v. Department of Army*, 670 F.2d 43 (5th Cir. 1982).

In 1974 Congress amended the Flood Control Act to require the Corps, in formulating flood control plans, to employ the most economically, socially, and environmentally acceptable means of reducing or preventing flood damages. 33 U.S.C. § 701b–11(a); *Creppel v. U.S. Army Corps of Engineers,*

500 F.Supp. 1108, 1117 (E.D.La.1980), *rev'd and remanded*, 670 F.2d 564 (5th Cir. 1982). Even if the Corps did, in mid-1972, propose an alignment similar to that along which plaintiff later began construction of a levee, the Corps was not bound by that proposal. *Id.* at 572.

The Corps was, however, required to take subsequently enacted federal legislation, including the FWPCA, the amendment to the Flood Control Act, and the Park Act and regulations, into account in developing a proposal for hurricane protection on the West Bank. Even if the 1972 proposal had passed an earlier cost-benefit analysis, the Corps could not ignore the Congressional policies expressed in subsequent legislation. Thus, the Corps has properly considered subsequent legislation, specifically that legislation relating to environmental protection and to establishment of Jean Lafitte Park, in developing a flood control proposal for the West Bank.

Development of recommendations for flood control projects is entrusted to the Corps' discretion. 33 U.S.C. § 701b–8. However, the only body with authority to make a final determination as to whether or where a flood control project will be funded and built is Congress. Flood control, dealing as it does with the regulation and flow of navigable waters, is a responsibility that devolves from Congress' Commerce Clause power. Even if this court chose to question what is clearly a rational legislative judgment, this court lacks the authority to order the Corps to build a hurricane levee along the alignment of plaintiff's incomplete levee, as plaintiff has asked the court to do.

■ This court finds that plaintiff has failed to present evidence entitling it to relief. Further, the court finds that the Corps has not erred either in proposing a hurricane levee alignment that does not include the entirety of the area in question or in having not yet constructed a levee.

*Takings*

■ Plaintiff's exclusive remedy for claims of uncompensated takings, through delay or otherwise, if any are present in this case, rests with the Court of Claims under the Tucker Act, 28 U.S.C. § 1491. *American Dredging Company v. Dutchyshyn*, 480 F.Supp. 959 (E.D.Pa.), *aff'd*, 614 F.2d 769 (3d Cir. 1979). Framing the complaint as one for injunctive relief cannot defeat Court of Claims jurisdiction. *A.L. Rowan & Son v. Department of Housing*, 611 F.2d 997 (5th Cir. 1980). Because plaintiff has an adequate remedy at law for money damages if, indeed, any taking of plaintiff's property has occurred, injunctive relief is not appropriate in this case. *Regional Rail Reorganization Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).