Jacques J. CREPPEL, et al.,
Plaintiffs-Appellants,

v.

The UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,
Defendants-Appellees.

No. 80–3743.

United States Court of Appeals,
Fifth Circuit.

March 17, 1982.

Harold L. Molaison, Gretna, La., for H. Molaison, L. Molaison, Barry Samuel, Bernard Samuel and M. Samuel.

Joseph E. LeBlanc, Jr., New Orleans, La., for J. Creppel, K. Knight, K. Carter, F. Creppel, D. Morrow, R. Pitre, W. Pitre, I. Goldman, B. Goldman, W. Mosby, B. Euganks and R. Fleming.

Bruce M. Chadwick, Washington, D.C., for Nat. Wildlife, amicus.

A. Donald Mileur, Appellate Section, Land & Natural Resources Division, James W. Moorman, Anne S. Almy, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before BROWN, COLEMAN and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The owners of some of the land that would be benefitted by completion of a small flood control project, approved eighteen years ago, contest the validity of a Corps of Engineers directive that would modify the project so as to eliminate the pumping station that would drain their land. The district court found that the official directive was neither arbitrary nor capricious, its issuance was within the discretion permitted by the controlling statute, and rendered summary judgment in favor of the United States and against the land-owners, dismissing their suit. *Creppel v. United States Army Corps of Eng'rs*, 500 F.Supp. 1108 (E.D.La.1980). While we agree that the order was not arbitrary, we conclude that it was issued without satisfying the statutory requirement that local assurances be obtained to avoid future cost to the federal government, and we, therefore, reverse the summary judgment and remand for further proceedings.

### I.

Congress has authorized flood control projects if the benefits that accrue exceed each project's estimated cost and if the lives and social security of people would be adversely affected were the project not undertaken. 33 U.S.C. § 701a (1976). At the time this project was begun, the Secretary of the Army was authorized to allot $1,000,-000 for a flood control project when in the opinion of the Chief of Engineers such work was advisable. 33 U.S.C. § 701s (1970) (amended 1976). Congressional approval for such an undertaking, commonly called a small flood control project, is not required. *Id.* Before appropriated money may be expended, however, states or local political subdivisions must give assurances, satisfactory to the Secretary of the Army, that all easements necessary for the work will be provided, that the United States will be held harmless from damages due to the work undertaken, and that local authorities will "maintain and operate all works after completion in accordance with regulations prescribed by the Secretary of the Army." 33 U.S.C. § 701c (1976). The obvious reason to require the assurance that local government will defray operating expenses is to ensure that the federal expenditure is limited to the initial cost and the project does not impose a continuing burden on the federal fisc.

The issues in this case cannot be comprehended without reviewing the twenty-one year history of the project. As early as 1961, a Senate resolution suggested investigation of the possibility of this project. The House Committee on Public Works adopted a resolution in 1962 calling for a

study of the proposed land improvement. In 1963, the study was completed[1] and a small flood control project, the Harvey Canal-Bayou Barataria Levee Project, was proposed for Jefferson Parish, Louisiana. The project was approved by the Corps in 1964, federal funding to be "dependent upon the availability of funds from future appropriations as well as local actions toward providing the required local cooperation."

The parochial authorities furnished the Chief of Engineers with the requisite assurances of local cooperation in 1967.[2] These assurances included commitments to construct a pumping station and, after completion, to maintain and operate "all works" in accordance with regulations of the Secretary of the Army. This would, of course, include maintenance of the levees as well as maintenance and operation of the pumping station. Jefferson Parish specifically agreed in a Supplemental Act of Assurances executed in 1967 to bear any costs in excess of the $1,000,000 that the Secretary was authorized to allot towards construction of the project. To provide the funds needed for carrying out its assurances, Jefferson Parish and its Consolidated Drainage District No. 1 passed a $3,600,000 drainage bond issue in April 1967. Before project construction was begun, an Environmental Impact Statement was prepared and filed.

The project, designed to provide flood protection and hence increased land utilization for 11,700 acres, was originally planned to involve federal expenditures of $492,000, and was to be constructed in two phases. The upper 8,000 acre portion of the project area had been leveed and drained to some extent in 1962 by the Consolidated Drainage District. The lower 3,700 acres of the project area were unleveed and undrained prior to federal involvement.

To execute Phase I of the project, new levees were built along an eleven-mile segment of the west bank of the Harvey Canal and Bayou Barataria and existing levees were improved, enclosing the 8,000 acres already protected to some extent by levees and the unprotected 3,700 acres to the south. Contrary to the original plan, which had called for the closing of two navigable water bodies, Bayou aux Carpes and Bayou des Familles, during Phase II, Bayou des Familles was partially closed during Phase I in June 1973, and Phase I was completed in that year. During this phase, the cost of the project exceeded the original estimate, and all of the federal funds that could be authorized for the entire project were spent. The local governmental units had spent so much that eighty percent of the total project cost had been expended.

It was necessary to wait at least two years after completing the construction on Phase I levees before beginning Phase II because the newly built levees would settle. Phase II, which was to be carried out entirely by Jefferson Parish, included adding additional material to the levees to restore them to a six foot elevation,[3] closing the gaps that had been left in the levee at a pipeline crossing and at Bayou des Familles, which had been partially closed, closing Bayou aux Carpes, and constructing a pumping station at Bayou aux Carpes to drain the 3,700 acres of swamp and marshland behind the new levees.

After Phase I had been started, Congress adopted the Federal Water Pollution Control Act Amendments of 1972, Pub.L.No. 92–500, 86 Stat. 884 (effective Oct. 18, 1972), as an amendment to the Federal Water Pollution Control Act, often referred to as the Clean Water Act. Section 404 of the Clean Water Act, now codified at 33

---

1. Report serial no. 29, U.S. Army Engineer District, New Orleans, Corps of Engineers, New Orleans, Louisiana, "Harvey Canal—Bayou Barataria Levee Louisiana," Dated 20 September 1963.

2. The Parish had tentatively agreed to provide the required assurances in 1963.

3. Colonel Heiberg estimated the fill required for Phase I was 1.3 million cubic yards and that 300,000 cubic yards would be needed for Phase II.

U.S.C. § 1344,[4] requires a permit from the Secretary of the Army for the discharge of dredged or fill materials into navigable waters. The Secretary, who may act through the Chief of Engineers,[5] is directed to apply guidelines developed by the Environmental Protection Agency Administrator, in conjunction with the Secretary, in issuing such permits. *Id.* § 1344(b). The EPA Administrator is authorized to prohibit a permit whenever he determines "that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas." *Id.* § 1344(c). Federal activities are subject to the permit requirement. *Id.* § 1323(a). In July 1974, the Corps of Engineers adopted regulations stating the procedures it would follow to conform its programs to the requirements of the Clean Water Act. 33 C.F.R. § 209.145, 39 Fed. Reg. 26,635 (July 22, 1974).[6]

Phase II construction began in mid-1974.[7] On July 18, 1974 (before the publication of the final regulations), the bids to close Bayou aux Carpes were opened for Parish consideration. The closure was begun on August 27 and completed by October 31, 1974.[8] On September 5, 1974, the bids to complete the pumping station were opened and the contract was awarded shortly thereafter. The contractor had purchased supplies but had not yet begun work when, in November 1974, the Corps notified Jefferson Parish that Section 404 of the Clean Water Act, 33 U.S.C. § 1344, was applicable to the project. The Corps requested that the Parish cease all Phase II construction until the Corps had held a public hearing and conducted the public interest review required by the implementing regulations adopted pursuant to the Act.

All Phase II work stopped and none has since been resumed. At the time of the work stoppage, major portions of the construction work called for in the original project plan for Phase II had not been completed, including the lifting and shaping of the levees to bring them to required project height, and construction of the

---

4. In pertinent part this section provides:
   (a) The Secretary [of the Army] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites....
   
   *    *    *    *    *    *
   
   (c) The Administrator [of the Environmental Protection Agency] is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

5. 33 U.S.C. § 1344(d).

6. Proposed regulations had been published on February 19, 1974.

7. In February 1974, Jefferson Parish applied for a permit under the general permit clause, Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, to begin Phase II. The Corps accepted the application, then decided that no permit was required because the Phase II construction was part of a civil works project of the Corps of Engineers, which the Corps had exempted by regulation from the requirements of Section 10.

8. According to Colonel Heiberg, "[n]o dredged material was used in the construction of the closure. A shell closure was constructed in such a manner that the weight of the deposited shells 'rolled' a blanket of soft bottom material to form an earthen berm on the flood side of the closure." Letter from Colonel Heiberg to Barry Kohl, Chairman, Conservation Committee, Orleans Audubon Society (Jan. 25, 1975). *But see* Letter from Colonel Heiberg to Division Engineer, Lower Mississippi Valley (Oct. 18, 1974) ("Dredging of material for the closure and physically closing Bayou Aux Carpes represents the specific work requiring compliance with Section 404. The pumping station proper, although an integral part of the overall scheme, does not involve dredging or other work which would be in violation of the act.").

pumping station at Bayou aux Carpes. The levee-raising work would require the discharge of some material into the bayous, which are navigable waters.

The regulations state that the determination to issue a permit for the discharge of materials will be made in accordance with the EPA guidelines issued pursuant to 33 U.S.C. § 1344(b),[9] and note the authority of the EPA Administrator to prohibit discharge in certain areas under 33 U.S.C. § 404(c); 33 C.F.R. § 209.145(b)(1). The District Engineer is required, *inter alia*, to issue a public notice of the project, consider all comments received, including those from other federal agencies, and conduct a public hearing if one is requested by any interested party or if he finds one necessary for proper evaluation of the proposed project. 33 C.F.R. § 209.145(f)(1).

The regulations provide for the protection of wetlands and list other environmental factors to be considered in determining whether to issue a discharge permit. The District Engineer is authorized, in most circumstances, to make a final decision and he is required to make a statement of findings (SOF) to support this final decision. *Id.* § 209.145(f)(1)(vii). The Corps does not issue a formal "permit" to itself; instead, the statement of findings serves the same purpose and is, in effect, the permit for the federal project. *Id.* The SOF must set forth "the conditions under which the disposal will be performed." *Id.*

The regulations reserve the final decision-making power in some circumstances to the Division Engineer or Chief Engineer. *Id.* § 209.145(i). If, however, the Regional Administrator of the EPA objects to the site or if he notifies the District or Division Engineer of his intention to veto its use, the case is forwarded to the Chief of Engineers in Washington, D.C., for resolution. *Id.* § 209.145(i)(2). In such cases, the District Engineer prepares a proposed statement of findings (SOF) as part of the report for the Chief of Engineers. *Id.* § 209.145(k).

After work on Phase II was stopped, the Corps held a public hearing in Gretna, Loui-

siana, on January 7, 1975. It received substantial public comment with respect to whether the project should be completed in accordance with the original plans. The landowners who hoped to benefit from the land reclamation incidental to the project uniformly favored completion. The remainder of the public comment was largely negative. The Fish and Wildlife Service of the United States Department of the Interior submitted comments urging modification of the project plan and opposing the loss of the fish and wildlife resources within the project area which it termed "of high value." In March 1975, the New Orleans District Engineer, Colonel E. R. Heiberg, III, issued an SOF in which he concluded that the project should proceed as originally planned.

In April 1975, the EPA took exception to the Heiberg SOF. It objected to completion of Phase II as originally designed and suggested that an alternative to draining the wetlands be employed to avoid "the irretrievable loss of valuable wetlands" which it stated would "not be in the public interest." In accordance with its regulations, the Corps of Engineers then forwarded the case to its Division and Washington offices for discussion with the EPA. Thereafter, in October, Brigadier General Kenneth McIntyre concurred in the Heiberg SOF. The EPA continued to object to the statement of findings and notified the Corps of its intention to exercise its authority under the Clean Water Act to prohibit the discharge of any material at the site.

During late 1975 and early 1976, the EPA and the Corps continued to discuss the project and each agency remained firm in its position. The agencies met, conducted site visits, and continued to evaluate the project. In June 1976, Colonel Early Rush, the District Engineer of the New Orleans Corps District, considered additional guidelines that had been published in July and September 1975, 40 C.F.R. § 230, and issued a revised SOF in which he concurred with the Heiberg SOF. The matter was again

---

**9.** 33 C.F.R. § 209.145(b)(1). *See* EPA guidelines at 40 C.F.R. § 230.

referred to Washington. On August 27, 1976, Brigadier General Drake Wilson, Deputy Director of Civil Works, wrote the EPA a letter stating that he concurred in the Rush SOF and intended to permit the Parish to start work to complete the project if the EPA did not invoke its statutory authority to object.

The EPA continued to oppose the placement of dredged and fill material associated with the completion of Phase II construction and requested that the Corps delay resumption of construction to permit further review of the project. At a meeting between representatives of the Corps and of the EPA in Washington in the fall of 1976, General Wilson attempted to resolve the differences between the agencies concerning the project. The EPA advised the Corps, however, that it would not concur in the SOF.

On October 7, 1976, General Wilson took a field trip to the project. He met with a group that included congressional staff members, Parish officials, and representatives of the Corps, the EPA, local interests, and environmental organizations. A member of the Jefferson Parish Council then informed General Wilson that the Parish would not insist on completion of Phase II as originally planned. This Council member informed General Wilson that representatives of the Corps and the Parish would be satisfied with a change in Phase II to eliminate the wetlands drainage if hurricane protection were provided. This proposal was satisfactory to General Wilson and to the EPA. The Jefferson Parish official promised that the Parish Council would adopt an ordinance requesting the change unanimously. Later he told General Wilson that this action might create problems in negotiating a settlement with the company that had contracted to erect the pumping station and had already delivered materials to the site, so he asked that the Corps take the first action, then allow the Parish to concur in it. This, presumably, would improve the bargaining power of the Parish in negotiating the termination of the pumping station contract.

On November 16, 1976, General Wilson issued his final SOF modifying the flood control project in several important respects. First, he deleted the construction of the Bayou aux Carpes pumping station. This would affect principally the 3,700 acres for which new levees had been constructed; a pumping station erected by local interests, the Roussel pumping station, would continue to drain the rest of the land. Second, he ordered that the "earthen dikes" closing Bayou aux Carpes and Bayou des Familles be removed and replaced with moveable flood gates "to restore and maintain normal water flows." Flood control levees along Bayou Barataria were to be completed to their project design elevation by Jefferson Parish and maintained by the Parish. The removal of the bayou closures and the installation and maintenance of the movable flood gates were also to be accomplished by the Parish, but the gates were to be operated in accordance with a plan approved by the District Engineer.

The last paragraph of the SOF states, "I find that the revised project is a reasonable balance between the need to provide protection from hurricane-induced flooding and the need to protect a productive wetland." The accompanying letter states that a meeting had been held with EPA representatives and others in Jefferson Parish on October 7, that Colonel Rush had met with a Jefferson Parish official on November 11, and that agreements were reached to the same effect as the conclusions in the SOF.

The EPA concurred with this decision. The Jefferson Parish authorities, however, have never taken any formal action to concur in the changes or to assume responsibility for removing the bayou levees, or for installing or maintaining flood gates. Shortly after this suit was begun, the landowners filed a separate action in state court to prohibit the Parish from implementing the Wilson Order, and to compel the Parish to complete the project by construction of the pumping station at Bayou aux Carpes. A final judgment has been rendered in that proceeding permanently enjoining the Parish from abandoning the pumping station at

Bayou aux Carpes and ordering the Parish to proceed with its construction.[10]

## II.

This lengthy factual recital clears the argumentative smog and brings the important issues into focus. It is based entirely on the evidentiary materials submitted with the counter-motions for summary judgment. There appears to be no genuine dispute about any of it.

■ Detailed examination of the various SOF's shows that each officer considered the same basic facts. The final decision was judgmental, not preordained by the facts. There were sound arguments, based on adverse environmental impact, against completing Phase II as originally contemplated. One of the important factors noted in all of the SOF's was that governmental policy with regard to environmental protection had changed in the years the project had been underway. For instance, the Fish and Wildlife Service of the United States Department of the Interior had stated in 1962 that the fishing resources of the project area were of low value and had voiced no objection to the project. By 1975, however, it had changed its position, considered these resources of great value, and opposed Phase II. This change was not simply bureaucratic vacillation. No chapter and verse recital is required to document the profound change in congressional environmental policy and statutory requirements between 1962 and 1975. Brigadier General McIntyre stated in a letter to the EPA, "[w]e further recognize that if the project was being formulated today that an entirely different approach might well be taken." Another matter stressed by the Corps was the change of position by the Jefferson Parish authorities. A change in position by the local government body bearing sole financial responsibility for the project was a factor properly to be considered even if it was not determinative.

That other Corps officials made SOF's reaching conclusions different from General Wilson's and that he himself earlier reached a conclusion at variance with his final SOF concludes nothing. The SOF's forwarded to the Chief of Engineers or his delegate are preliminary internal determinations, made as recommendations for higher authority. They are naught until finally approved. In the words of the apocryphal umpire, "They ain't nothin' until I call 'em." Unless the facts brought out in the earlier SOF's demonstrate that the final SOF was arbitrary and capricious, they must be disregarded as merely preliminary.

■ Judicial review of administrative action focuses on the final agency action not on the reports of subordinate officials, hearing examiners, or administrative law judges. An agency is not forever bound by its prior determinations for they are neither congressional directives nor scriptural admonitions. Moreover, an agency may adjust its policies and rulings in the light of its experience. See In re Permian Basin Area Rate Cases, 390 U.S. 747, 784, 88 S.Ct. 1344, 1369, 20 L.Ed.2d 312 (1968) ("Nor may [the Commission's] order be set aside merely because the Commission has on earlier occasion reached another result; administrative authorities must be permitted, consistently with the obligations of due process, to adopt their rules and policies to the demands of changing circumstances."); American Petroleum Inst. v. EPA, 661 F.2d 340, 355 (5th Cir. 1981) ("Nothing in the Administrative Procedure Act prohibits an agency from changing its mind, if that change aids it in its appointed task."); Montana Power Co. v. EPA, 608 F.2d 334, 347–49 (9th Cir. 1979). Indeed the purpose of internal agency review is to determine whether preliminary findings are factually accurate and accord with statutory requirements and agency policy. The agency director or board entrusted with final authority is not a mere rubber stamp for subordinates, but is expected to consider intervening developments and finally to use its own judgment; otherwise there would be no

---

10. *Creppel v. Parish of Jefferson*, No. 199–345 (La.Dist.Ct. Jan. 12, 1979), *aff'd*, 384 So.2d 853 (La.Ct.App.1980), *writ denied*, 392 So.2d 689 (La.Sup.Ct.1980).

need for an agency review of preliminary agency determinations.

■ The various SOF's were not findings in the legal sense nor do they constitute a record of evidence. It is for this reason that we are required to affirm them unless they are arbitrary or capricious, *Watkins Motor Lines, Inc. v. ICC*, 641 F.2d 1183, 1189 (5th Cir. 1981) ("If the agency considers the relevant factors and articulates a rational connection between the facts found and the choice made, the decision is not arbitrary or capricious."); 5 U.S.C. § 706(2)(A). Such determinations must be distinguished from agency decisions made on an evidentiary record for the latter are reviewed by determining whether the findings are supported by substantial evidence, 5 U.S.C. § 706(2)(E).

■ When Brigadier General Wilson made his final SOF in 1976, he did not dissimulate. The Parish was urging him to change Phase II. The EPA and private environmental groups threatened litigation if he did not require the change, the landowners threatened lawsuits if he did. Recognizing that, as he stated in his deposition, the Corps would be sued no matter what decision he made, he made an SOF that had ample factual support and was based on cogent policy reasons. Whether we would reach the same conclusion is of no consequence, for Congress has imparted this decision to the Corps of Engineers. *C.A. White Trucking Co. v. United States*, 555 F.2d 1260, 1264 (5th Cir. 1977) (the court of appeals does "not sit as a trier of fact" and it is not its function "to weigh the evidence pro and con").

The record reflects that the Corps' officers at every level gave the highly charged issue full consideration, heard all opposing factions, studied and restudied the site, met and conferred with the landowners, local officials, private environmental groups, members of Congress, and the EPA in a patient effort not only to discharge the Corps' duty but to attempt to achieve an accord. It should be noted that the Corps' decision alone could not assure the completion of Phase II. The EPA could bar the door.[11] Moreover, at this stage, no more federal money would be expended; all further financial burden would fall on local government. The Corps officials would have been foolish, perhaps even arbitrary, had they ignored these matters.

The November 16 directive does not abandon the project and leave things as they stand, unfinished. It requires completion of the levees to the contemplated six-foot height and their maintenance at that height. It requires removal of the earthen dikes closing Bayou aux Carpes and Bayou des Familles, the installation and operation of flood gates, and eliminates the proposed pumping station. There is evidence that, when the project as modified by the November SOF is completed, it will provide flood and hurricane protection. The evidence concerning the value of the flood gates is contradictory, but there is substantial basis for the conclusion that the flood gates will protect the project from hurricane induced flooding, and can regularly be opened to permit the wetlands to survive.

■ The directive does, of course, make a major change in the project. The hand that approves projects initially has the implied power to change their course. *United States v. Sponenbarger*, 308 U.S. 256, 268, 60 S.Ct. 225, 230, 84 L.Ed. 230, 239 (1939). Even when a project's purpose is authorized by Congress,[12] the executive officer charged with responsibility for the project may modify its purpose unless this action is so foreign to the original purpose as to be arbitrary or capricious. *United States v. 2,606.84 Acres of Land*, 432 F.2d 1286, 1290 (5th Cir. 1970) (condemnation proceedings). It imparts both stupidity and impracticality to Congress to conclude that the statute impliedly forbids any change in a project once approved, and thus prevents the agency official from providing for the unforeseen or the unforeseeable, from ac-

---

11. *See* 33 U.S.C. § 1344(c).

12. This project did not require congressional approval. 33 U.S.C. § 701s.

commodating newly discovered facts, or from adjusting for changes in physical or legal conditions. Any change must, however, serve the original purpose of the project. *United States ex rel. Chapman v. FPC*, 191 F.2d 796, 807 (4th Cir. 1951), aff'd, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953); *Ryan v. Chicago B&Q R. Co.*, 59 F.2d 137, 142 (7th Cir. 1932). The modifications must be accomplished with adequate notice and in accordance with the procedure mandated by federal regulations. The modifications must not disregard or seek to evade the substantive statutory requirements. But alteration is not forbidden.

The landowners do not contend that all change is prohibited, but assert that the November 16 directive "abandoned" all of the primary benefits and purposes for which the project was authorized. They argue that, because the project was authorized for dual purposes, (1) drainage and land reclamation and (2) flood control, any project change must fulfill both purposes. While there is no authority directly on point, cases dealing with executive changes in condemnation projects provide an analogy. Many cases have considered the extent to which the executive may exercise the power of condemnation to appropriate lands for ends that modify the original purpose for a specific project, as stated by the Congress and authorized by a particular statute or appropriation. *See, e.g., United States v. 2,606.84 Acres of Land*, 432 F.2d 1286, 1293 (5th Cir. 1970), *cert. denied*, 402 U.S. 916, 91 S.Ct. 1368, 28 L.Ed.2d 658 (1971); *Chandler v. United States*, 372 F.2d 276, 279 (10th Cir. 1967); *Maiatico v. United States*, 302 F.2d 880 (D.C.Cir.1962); *United States ex rel. TVA v. 0.08 Acre of Land*, 246 F.Supp. 408, 410 (E.D.Tenn.1965). Even in such cases, the ultimate issues are whether the statute implies a limitation and, if not, whether considering the congressional purpose, the modification is not arbitrary.

Congress left the decision about the ancillary purposes of small flood control projects to the Secretary of the Army. Congress authorized "small projects for flood control and related purposes not specifically authorized by Congress." 33 U.S.C. § 701s. The Secretary or his delegate might have authorized this project only for flood control and hurricane protection. Increased land utilization through land reclamation, was indeed a major justification for the project as originally proposed, but the protection of people and of land and the improvements on it are not the only reasons for flood control. The record contains substantial justification for the Corps' conclusion that flood control benefits would accrue from the project as modified. We do not sit as super-engineers to review the ultimate correctness of that conclusion.

■ The statute requires a benefit-cost analysis before a project is authorized. 33 U.S.C. § 701a. This does not imply a continual or even an annual accounting review to determine whether costs and benefits still stand in proper ratio. *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir. 1972) ("[T]his project was authorized many years ago by Congress on the basis of its determination that the benefits of the project exceed the costs. We do not think that the statement of policy in § 701a can be used as a vehicle for continuing evaluations of the project by the courts.").[13] Therefore, we decline to review the benefit-cost ratio as the district court did. 500 F.Supp. at 116–17.[14]

The November 16 SOF states, with support from the evidence before the Corps,

---

**13.** The court in *Froehlke* did note, however, that the "relief requested by the plaintiffs under § 701a is partially available under NEPA [National Environmental Policy Act]." 473 F.2d at 356. *See Environmental Defense Fund, Inc. v. Corps of Eng'rs*, 492 F.2d 1123, 1134 (5th Cir. 1974) ("We agree that NEPA requires a more comprehensive and pervasive weighing of costs and benefits than Section 701a contemplates"); *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404, 413 (W.D.Va.) ("Calculations of B/C [benefit/cost] ratios under the Flood Control Act and under NEPA are different."), aff'd, 484 F.2d 453 (4th Cir. 1973).

**14.** The district court concluded, however, that the benefit-cost ratio was still acceptable under 33 U.S.C. § 701a, even in the light of the project modification. 500 F.Supp. at 1117.

that "the flood control purposes of this project can be readily achieved" by the project as modified. Certainly, the owners of land in the 8,000 acre tract, now fully protected by levees and served by the Roussel pumping station, will benefit by the substantial enhancement in the value of those lands anticipated by the original project study. It is not unreasonable to conclude that the owners of the remaining 3,700 acres will gain some benefit, even though the full reclamation that was contemplated by draining the wetlands will not be accomplished.

### III.

There is a problem with the Corps' order, however. The Corps has not offered evidence of assurances from Jefferson Parish that it will implement the Wilson directive. The Corps' regulations do not in terms require local assurances as a condition to project modification but only before construction is undertaken, 33 C.F.R. § 209.220(a). This is presumably on the thesis that normally the local assurances given will satisfy all local obligations required by a modification. That assumption is not warranted here, for, as we have noted, the undisputed facts are that with only $106,000 remaining from its bond issue the Parish is required by the change to under-

take different obligations from those that would have been incumbent on it under the original Phase II. Whether these obligations will be more or less onerous or more or less costly is not for us to determine, but it is at least reasonable to conclude that the relatively small sum on hand will not suffice and that the Parish will be required to appropriate additional sums to terminate the pumping station contract, to remove the bayou closures, to construct the flood gates, and to complete the levees, as well as to operate and maintain the project.

Accepting the Corps' argument, the district court held that the sufficiency of assurances of local cooperation is a matter of agency discretion, and cannot be reviewed.[15] Courts, indeed, have no authority to review the Secretary of the Army's subjective evaluation if there is some evidence to support it. *E.g., Akers v. Resor*, 339 F.Supp. 1375 (W.D.Tenn.1972). The statute undeniably vests broad discretion in the Secretary. But we are concerned not simply with the "sufficiency" of assurances, but with the complete absence of any assurances on the record now before us. In view of the state court judgment requiring the Parish to complete the pumping station, no assurance that it will defray the cost of the modification may be obtainable. If so, the November 16 directive is either but idle words,

---

**15.** 500 F.Supp. at 1117. In addition, the district court held that the plaintiffs had "no standing to sue on the basis of the Corps failing to get adequate assurances of cooperation." *Id.* We disagree with this holding because the plaintiff-landowners will be injured if the project is completed as modified instead of completed as originally planned. Although their land will benefit from flood protection under the modified project, their land will not be drained as it would have been under the original project. As the Supreme Court recently stated,

at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38,

41 [96 S.Ct. 1917, 1924, 1925–26, 48 L.Ed.2d 450] (1976).
*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, —— U.S. ——, ——, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).
In *Akers v. Resor*, 339 F.Supp. 1375, 1378 (W.D.Tenn.1972), the court held that the plaintiffs, members of an environmental group, had no standing to challenge § 701c assurances because the plaintiffs sought to protect ecology and that interest "is not arguably within the zone of the interest intended to be protected by this statutory provision." The interests of the landowners in this case, however, are within the zone of interests protected by the statute; their interest is the assured completion of the project and the accompanying benefits to their land. *Cf. United States v. City of Irving*, 482 F.Supp. 393, 395 (N.D.Tex.1979) (no cause of action under 33 U.S.C. § 701c in favor of the City of Dallas because such an action "would be inconsistent with the scheme of federal enforcement evident in the regulations").

commanding what no one can obey, or it imposes an obligation on the Corps beyond the monetary limits permitted by the statute. Whether this is a fatal defect, we cannot determine. It is a sufficient reason, however, to deny summary judgment in favor of the Corps.

Whether Section 404 of the Clean Water Act, 33 U.S.C. § 1344, prohibits completion of the project may be an issue for the trial court on remand.[16] Whether either the EPA or Jefferson Parish or both are indispensable or proper parties are questions not yet posed. The applicability of the Clean Water Act cannot be determined collaterally and prematurely on a motion for summary judgment in an action in which the EPA has not even had a chance to be heard. Both for these reasons and for the other reasons already given, we must reject the landowners' demand for a summary judgment.

At this time, we cannot determine from the record before us, made up for summary judgment purposes, whether further proceedings in the district court would be appropriate or whether it is necessary to remand the case to the Corps to supplement the record and to determine whether the EPA will exercise its veto authority. In their haste to score a complete and early victory, the parties have presented summary judgment motions and raised and briefed only the issues immediately apparent. All that we can now decide is that summary judgment in favor of the landowners was properly denied and that summary judgment in favor of the Corps was not supported by the record. We, therefore, REVERSE the summary judgment in favor of the Corps, and REMAND for further proceedings consistent with this opinion.

---

**16.** *See generally* Blumm, The Clean Water Act's Section 404 Permit Program Enters Its Adolescence: An Institutional and Programmatic Perspective, 8 Ecology L.Q. 409, 411 (1980) ("the first five years of the program were largely devoted to defining and debating its scope of authority rather than ensuring its effective implementation"); Caplin, Is Congress Protecting Our Water? The Controversy Over Section 404, Federal Water Pollution Control Act Amendments of 1972, 31 U.Miami L.Rev. 445 (1977); Note, Federal Control of Wetlands: The Effectiveness of Corps' Regulations Under § 404 of the FWPCA, 51 Notre Dame Law. 505 (1976).

