ORLEANS AUDUBON SOCIETY, et al., Plaintiffs-Appellants,

Sierra Club, Intervenor-Appellant,

v.

Colonel Robert C. LEE, in his official capacity as District Engineer, et al., Defendants-Appellees.

No. 83–3389.

United States Court of Appeals, Fifth Circuit.

Oct. 1, 1984.

Rehearing and Rehearing En Banc Denied Nov. 16, 1984.

Frank A. Silvestri, Derbes & Derbes, Peter D. Derbes, New Orleans, La., for plaintiffs-appellants.

Carol E. Dinkins, U.S. Dept. of Justice, Washington, D.C., William F. Baity, Asst. U.S. Atty., New Orleans, La., Dirk D. Snel, Arthur E. Gowran, U.S. Dept. of Justice, Washington, D.C., Harless Benthul, U.S.E.P.A., Dallas, Tex., Catherine Winer, U.S.E.P.A., Washington, D.C., for defendants-appellees.

Joseph E. LeBlanc, Jr., New Orleans, La., for C.I.T.

Before REAVLEY, JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

## I.

### A.

This environmental suit involves a 466-acre tract of cypress-tupelo gum swamp located on the west bank of the Mississippi River in Jefferson Parish, Louisiana. The tract is bounded on the northeast by a residential subdivision known as Lincolnshire, on the west by the Drill Hole Canal, a small artificial canal constructed during the 1960s, and on the east by a levee, on the other side of which runs the Millaudon Canal. The tract is surrounded by levees constructed in 1972 by the owner of the property at that time. In late 1972 or early 1973, the Drill Hole Canal, which previously had been a navigable waterway, was dammed, completing the ring of levees and impounding the tract so that it was no longer subject to tidal motion.

In late 1976 or early 1977, C.I.T. Corporation became the owner of the tract through foreclosure and decided to proceed with the previous owner's plans to convert the tract for residential use by draining and filling the area within the levees. In order to do so, C.I.T. began working with the Corps of Engineers to prepare the environmental impact statement needed to secure an after-the-fact permit for the closure of the Drill Hole Canal. *See infra*, part B. In late 1979, the Corps discovered two gaps in the levee at the closure of the Drill Hole Canal. After receiving assurance from the Corps that no permits were required for the work, C.I.T. repaired the two gaps.

In 1980, C.I.T. installed a drainage culvert into the levee between the tract and the Lincolnshire subdivision. This culvert permitted gravity drainage from the tract into a drainage canal serving the subdivision. Because the first culvert was ineffective, in 1981 C.I.T. installed a second culvert into the levee at a lower elevation.

### B.

The Corps of Engineers first became involved in this case in March 1976, when it received a citizen's complaint that the Drill Hole Canal had been blocked in violation of the Rivers and Harbors Appropriation Act of 1899 (RHA) and federal regulations which require the issuance of a permit for activities which result in the obstruction of navigable waters. Soon after receiving the complaint, the Corps issued a cease and desist order to the developer of the tract (C.I.T.'s predecessor in interest) and ordered the developer to apply for an after-the-fact permit for the canal blockage and for maintenance of the levee system around the tract. After C.I.T. became owner of the tract, it filed the necessary application. The Corps decided that it

would have to prepare an environmental impact statement before granting or denying the permit application in order to comply with its responsibilities under the National Environmental Policy Act, § 102, 42 U.S.C. § 4332 (1977).

Between late 1977 and June 1979, the Corps proceeded with the development of an environmental impact statement and took other steps to review C.I.T.'s application. During this time, several federal agencies, including the Environmental Protection Agency, the National Park Service and the United States Fish and Wildlife Service, notified the Corps of their opposition to the granting of the permit and their intention to participate in hearings on the matter.

In the spring of 1979, C.I.T. first inquired of the Corps whether the blockage of the Drill Hole Canal fell within the scope of nationwide permits issued by the Corps in July 1977. These nationwide permits authorize certain classes of activity within the scope of the Corps' jurisdiction to be carried out without an individual project permit. The Corps agreed with C.I.T. that its activities were authorized by the nationwide permit and did not require an individual permit. In September 1979, the Corps advised C.I.T. that its proposed repair of gaps in the levees surrounding the tract was also authorized by the nationwide permits.

In early 1980, Orleans asked the Corps to reconsider its two decisions regarding the applicability of nationwide permits. The Corps considered Orleans' arguments and consulted with personnel of the Environmental Protection Agency before deciding, after almost one year, to stand by its determinations that the canal blockage and levee repair were authorized by the nationwide permits. During this period of reconsideration, the Corps inspected, also at Orleans' request, the installation of the two drainage culverts in the tract's northeast levee. The Corps engineer who inspected the site

reported that the installation did not involve any work upon the wetlands in the interior of the tract, nor did it result in the depositing of dredged or fill material into the wetlands. The Corps concluded that it had no basis to assert jurisdiction over the culvert installations.

### C.

Orleans filed this suit in June 1981, seeking declaratory and injunctive relief from the Corps' decision that C.I.T. was not subject to individual permit requirements for three activities: the blockage of the Drill Hole Canal, the repair of levees around the tract and the installation of culverts to drain the tract. One year later, the plaintiffs[1] filed a motion for partial summary judgment, arguing that permits were required as a matter of law for installation of the two drainage culverts. The defendants[2] countered with motions to dismiss the complaint or, in the alternative, for summary judgment on all issues raised by the plaintiffs. The district court, after a hearing, granted the defendants' motions and dismissed the complaint, holding that none of the decisions not to require permits was arbitrary or capricious. The plaintiffs now appeal the judgment of the district court.

### II.

Orleans concedes that we normally must review discretionary decisions of the Corps under the arbitrary and capricious standard, and it concedes that decisions not to require permits for actions by private developers, such as those at issue here, are usually considered to be discretionary. Despite these admissions, Orleans argues that we should review the first of the three decisions challenged in this case more closely because "a successor agency head [has], without any apparent valid reason, alter[ed] a three year old, apparently valid exercise of authority by his predecessor

---

1. "The plaintiffs" and "Orleans" include the Sierra Club, which was allowed to intervene in the suit.

2. "The defendants" include C.I.T., which was also allowed to intervene.

...." [3] The issues before this court, then, are (1) what standards of review to apply, and (2) whether the three challenged agency-decisions are reversible under the appropriate standards of review. Before discussing these issues, however, we shall canvass some of the statutes and regulations governing the Corps' decisions.

## III.

Orleans argues that there are two statutory schemes under which the Corps should have exercised its authority to require permits for the enclosure and drainage of the C.I.T. tract: the Federal Water Pollution Control Act, as amended in 1977, popularly known as the Clean Water Act (CWA), and the RHA.[4]

The Corps possesses regulatory authority relevant to this case granted by the Clean Water Act, which, in general, prohibits the discharge of pollutants into the navigable waters of the United States except in compliance with the CWA's terms.[5] Clean Water Act, §§ 301(a), 502(12), 33 U.S.C. § 1311(a), 1362(12) (1978). The Act authorizes the Secretary of the Army, acting through the Chief of Engineers, to "issue permits, after notice and opportunity for public hearings[,] for the discharge of dredged or fill material into the navigable waters at specified disposal sites," and to issue nationwide permits for some classes of activity. Clean Water Act, § 404(a), (e), 33 U.S.C. § 1344(a), (e) (1978).[6] In July 1977 the Corps enacted the nationwide permit regulations on which the Corps relied in this case to exempt the blockage of the Drill Hole Canal from individual permit requirements under the CWA. Those regulations provided for a phase-in of the individual permit requirements to wetlands and non-navigable waters.[7] Discharges into wetlands or non-navigable waters prior to the phase-in dates were not subject to individual permit requirements if they did not violate certain health and environmental restrictions, subject to the Corps' reservation of discretionary authority to require an individual permit if the circumstances "indicate the need for such action because of ... adverse impacts to the affected waters," 33 C.F.R. §§ 323.4–1(a), 323.4–4 (1977), superseded, see 47 Fed.Reg. 31,800 (1982). In addition to its authority to require individual permits for the depositing of dredged or fill material in navigable waters, the Corps may bring suits for injunctive and punitive relief for violations of permits issued under section 404. 33 U.S.C. § 1344(s) (1978). The Corps' 1977 regulations allowed district engineers to require an after-the-fact permit rather than

3. Actually, Orleans Audubon does not limit its argument to the first decision, i.e., to discontinue the after-the-fact permit process for the closure of the Drill Hole Canal. However, neither of the other decisions can be rationally characterized as a reversal of prior policy, since neither was presented to the Corps prior to the change in administration on which Orleans Audubon bases this argument.

4. The RHA is codified at 33 U.S.C. § 401, *et seq.*

5. Under the CWA, "pollutants" include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage, sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6) (1978).

6. The procedure by which the Corps determines whether to issue a permit under section 404 is described in *Creppel v. U.S. Army Corps of Engineers,* 670 F.2d 564, 569. (5th Cir.1982).

7. The 1977 regulations provided:
> If a discharge of dredged or fill material is not permitted by this regulation, an individual or general Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States in accordance with the following phased schedule:
> (1) Before July 25, 1975, discharges into navigable waters of the United States.
> (2) After July 25, 1975, discharges into navigable waters of the United States and adjacent wetlands.
> (3) After September 1, 1976, discharges into navigable waters of the United States and their primary tributaries, including adjacent wetlands and into natural lakes, greater than 5 acres in surface area.

33 C.F.R. 323.4–1(a) (1977), superseded by amended regulations, *see* 47 Fed.Reg. 31,800 (1982). The Corps has issued several nationwide permits under the authority of section 404(e); the present versions are codified at 33 C.F.R. § 323.4 (1983). *See* note 5, *supra.*

bring suit if "the unauthorized activity does not warrant legal action." 33 C.F.R. § 326.5 (1977).[8]

Orleans has also asserted claims relating to the Corps' regulatory authority under the Rivers and Harbors Act. Section 10 of the RHA prohibits the obstruction of the "navigable capacity" of the waters of the United States except as authorized by the Chief of Engineers and the Secretary of Army. 33 U.S.C. § 403. The Corps of Engineers has developed regulations which specify the circumstances under which it will authorize activities which obstruct navigable waters, as well as regulations which define "navigable waters" for the purposes of determining whether the Corps will exercise section 10 jurisdiction over particular bodies of water. Through these regulations the Corps has asserted jurisdiction over privately developed artificial channels, even those passing through private property, if they are susceptible to being used in support of interstate commerce. 33 C.F.R. 329.4, 329.5, 329.8 (1983). In general, the Corps requires individual permits for all "structures and/or work in or affecting navigable waters of the United States .... " unless the regulations specifically exempt the activity, 33 C.F.R. § 322.3(a) (1983), but it has established "nationwide permits" which exempt certain classes of activities from the individual permit requirements. Prior to July 22, 1982, nationwide permits promulgated under section 10 authority were codified at 33 C.F.R. § 322.-4.[9] These nationwide permits, promulgated by the Corps in July 1977, provide:

The following structures or work are hereby permitted for purposes of Section 10 and do not require separate Department of the Army permits:

. . . .

(c) The *repair*, rehabilitation, or replacement of any previously authorized,

currently serviceable, structure or *of any currently serviceable structure constructed prior to the requirement for authorization;* provided such repair, rehabilitation, or replacement does not result in a deviation from the plans of the original structure, and further provided that the structure to be maintained has not been put to uses differing from uses specified for it in any permit authorizing its original construction;

. . . .

(g) *Structures or work completed* before 18 December 1968 or *in waterbodies over which the District Engineer has not asserted jurisdiction provided there is no interference with navigation.*

33 C.F.R. § 322.4 (1977) (emphasis added). In this case, the Corps found that C.I.T. was exempt from the permit requirement for the blockage of the Drill Hole Canal on the basis of section 322.4(g), and the repair of the levees around the C.I.T. tract on the basis of section 322.4(c).

Section 9 of the RHA prohibits the construction of dams or dikes across navigable waters of the United States unless both Congress and the Secretary of the Army approve.[10] The Secretary of the Army has not delegated the authority to grant or deny section 9 permits to the Chief of Engineers, but the Corps' regulations under section 9 allow the district engineer of the relevant district to recommend "conditions to be imposed" upon authorized section 9 projects. 33 C.F.R. § 321 (1983).

IV.

A.

Orleans argues that because the Corps initially required C.I.T. to apply for an af-

8. The present regulation is similar. *See* 33 C.F.R. § 326.3(c) (1983).

9. In July 1982, the Corps combined the nationwide permit regulations promulgated under section 10 of the RHA with those promulgated under the authority of section 404 of the CWA. *See* 47 Fed.Reg. 31,798 (1982).

10. The approval of the state legislature may be substituted for that of Congress for dams and dikes to be built across wholly intrastate bodies of water.

ter-the-fact permit for the 1972–73 canal closure, the Corps' decision to abandon the permit process should be reviewed under a stricter standard than the usual "arbitrary and capricious" standard.[11] Because the reversal in position occurred after a change in the administration of the Corps' New Orleans District, we should, according to Orleans, view it with suspicion.[12]

■ This court has recently reaffirmed the principle that an agency may adjust its rules and policies in the light of its experience and changing circumstances. *Creppel,* 670 F.2d at 571; *American Petroleum Institute v. Environmental Protection Agency,* 661 F.2d 340, 355 (5th Cir.1981). Even when an agency abandons a prior determination, the reviewing court should affirm the agency's decision if the *final* agency action is not arbitrary or capricious. *Texaco, Inc. v. National Labor Relations Board,* 700 F.2d 1039, 1043 (5th Cir.1983); *Creppel,* 670 F.2d at 571–72.

■ Orleans invites this panel to modify the rules summarized above because in this case the reversal of an agency's position coincides with a change in agency leadership. We decline to depart from our traditional standard of review, however, because to do so would violate a basic principle of judicial review of agency action, that is, the presumption of regularity. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Orleans advances no persuasive reasons for abandoning this presumption here. If, in fact, the Corps' decision to discontinue the permit process for the Drill Hole Canal was made in bad faith or is otherwise not supported by the administrative record, then the decision will not withstand the arbitrary and capricious

standard. On the other hand, if the decision represents a valid exercise of the Corps' decision-making powers, then this court should not interfere with the Corps' judgment. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. To substitute a stricter rule of judicial review for changes of agency rules made by succeeding administrations would unnecessarily and inappropriately restrict the agency's discretion. The record in this case shows that the New Orleans district of the Corps has had three district engineers since 1976.[13] If this court considers each change of administration to undermine the traditional standards of deference outlined in *Creppel,* then only rarely would a federal agency such as the Corps be able to change its bureaucratic mind without being subject to a higher level of judicial scrutiny. Such a rule is, it seems to us, at odds with this court's policy of deference to matters generally committed to the expertise and discretion of federal agencies. *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983); *Buttrey v. United States,* 690 F.2d 1170, 1183–85 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

We therefore conclude that the Corps' decision not to require an after-the-fact permit for the closure of the Drill Hole Canal will be reviewed, as will the other two decisions challenged on appeal, under the arbitrary and capricious standard.

### B.

Orleans has challenged the three Corps decisions relating to the C.I.T. tract on the grounds that they violate the terms of the CWA. We first address Orleans' attack on

11. Normally, this court's review of decisions such as those challenged in this lawsuit is limited to whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B), (C), (D). *See Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904–05 (5th Cir.1983).

12. Colonel Early J. Rush was district engineer for the New Orleans district until August 1978,

when he was replaced by Colonel Thomas A. Sands. Colonel Robert C. Lee succeeded Sands as district engineer after this action commenced.

13. It appears from the statement of facts in *Creppel* that the New Orleans district was administered by still another district engineer, Colonel E.R. Heiburg, III, as late as 1975; the agency has, then, been under four administrations within the past decade.

the halting of the after-the-fact permit process for the closure of the Drill Hole Canal.

1.

■ In 1979, the Corps decided that the closure of the canal was within the scope of a nationwide permit promulgated under the CWA in 1977, 33 C.F.R. § 323.4–1(a), the text of which is set out *supra*, note 7. Under this regulation, the Corps did not require after-the-fact permits for discharges made prior to July 25, 1975, except for discharges "into navigable waters of the United States."

Orleans has not expressly stated why it believes its decision was arbitrary or capricious. Primarily, it relies on the fact that the decision not to require a permit was a reversal of the Corps' prior position. We examine, first, whether the Corps' decision appears to be a reasonable application of the regulation, and second, whether the Corps acted arbitrarily or capriciously in reversing the permit process.

The facts before the Corps were as follows. During 1972 and 1973, when this discharge occurred, the Corps did not consider the Drill Hole Canal to be a navigable waterway. The Corps did not exert jurisdiction over private, man-made canals, such as the Drill Hole Canal, during the period when this canal was actually blocked. In March 1976, the Corps issued a cease and desist order to the owner of the C.I.T. tract, basing its authority to require an after-the-fact permit on *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). This was the first time that the Corps even arguably asserted jurisdiction over the Drill Hole Canal. In 1977, the Corps formally amended its regulations to make it clear that private artificial canals subject to tidal action were within the Corps' jurisdiction.

In applying the nationwide permit regulation to this situation, the Corps decided that the discharge was not made into a "navigable water", based on the status of the Drill Hole Canal when the discharge occurred. In reasoning this way, the Corps chose not to use several other points in time at which it might have chosen to measure navigability: the enactment of the CWA, the promulgation of the 1977 regulations, or the time when the Corps was deciding whether to require an after-the-fact permit. Although the Corps did not actually discuss its rationale for choosing the date of the discharge, a valid rationale is immediately apparent: that is, the unfairness of exerting jurisdiction over activity which, when done, was clearly not within the Corps' jurisdiction. In fact, the Eleventh Circuit recently held that the Corps may not retroactively apply the CWA permit requirements against private developers in some situations. *United States v. Context-Marks Corp.*, 729 F.2d 1294 (11th Cir.1984); *Buccaneer Point Estates, Inc. v. United States*, 729 F.2d 1297 (11th Cir. 1984). While these cases arose in a factually dissimilar context from this one, their reasoning helps to persuade us that the Corps did not act arbitrarily or capriciously in interpreting this regulation.

Orleans relies primarily on 33 C.F.R. § 323.4–4, under which the Corps had discretionary authority to require an individual permit for a discharge otherwise exempted by the nationwide permits. Orleans contends that Colonel Rush was exercising his discretionary authority under this regulation when he began the after-the-fact permit process on the closure of the Drill Hole Canal, and that Colonel Sands acted arbitrarily in halting the permit process. Colonel Sands noted, however, that under the applicable regulatory guidelines that the Corps' policy was to apply the discretionary permit requirement only to proposed discharges, and not to completed discharges such as the canal closure. *See* 40 C.F.R. 230.1 (1975). His interpretation of the guidelines led him to believe that he had no authority to continue the permit process. This reading of the guidelines is a reasonable one, and we cannot say that Colonel Sands' decision not to invoke his discretionary authority constituted an abuse of that discretion, nor that it was arbitrary or capricious, even though it differed from his predecessor's opinion.

The Corps' decision that the 1972–73 closure of the Drill Hole Canal is covered by the 1977 nationwide permits under the CWA is, therefore, a reasonable interpretation of the nationwide permit regulation. In fact, although Orleans has argued on appeal that this interpretation was a reversal of the Corps' prior position, it is not clear from the record that the Corps actually considered whether the 1977 regulations might cover the canal closure before C.I.T. first requested the Corps to do so in 1979. Even if the decision is considered to be a reversal of prior Corps policy, under the "arbitrary and capricious" test which we must apply to such a decision, *see* part IV.A, *supra*, we find no basis in the record for reversing the Corps' determination that the activity at issue here was covered by the nationwide permit.

### 2.

■ Orleans also contends that the repair of the levees surrounding the C.I.T. tract in the fall of 1979 required permits under the CWA. When C.I.T. first contacted the Corps about repairing the levees, the Corps took the position that the repairs could be performed without a permit under the authority of section 404(f)(1)(B) of the CWA, which exempts the discharge of dredge of fill material for the purposes of maintenance of currently serviceable structures such as levees. In addition, the Corps found that a nationwide permit promulgated under the CWA, 33 C.F.R. 323.4–3(a)(5) (1977), covered the levee repair.[14] The Corps found that the levee was currently serviceable, as required by the statute and the interpretative regulation, because it served as a secondary flood and hurricane protection barrier for the nearby Lincolnshire subdivision.

Orleans argues that the Corps acted arbitrarily and capriciously in failing to require a permit for the levee repair because (1) the levee could not properly be characterized as "currently serviceable," and (2) the Corps did not make the necessary finding that the repair satisfied the conditions enumerated in 33 C.F.R. § 323.4–3(b) (1977).

Neither the CWA nor the regulations defines "currently serviceable," nor does the legislative history of the 1977 Clean Water Amendments. The Corps' determination that the levee was currently serviceable because it filled a need for a flood and hurricane protection barrier for the Lincolnshire subdivision is a reasonable interpretation of the term as it is used in the statute and regulation. Orleans does not challenge this interpretation directly; rather, its primary argument is that the currently serviceable structures of which the statute and regulations contemplate repair include only those structures which were legally built in the first instance. Because the levee was not authorized, Orleans contends, its repair is not exempted from the permit requirement.[15] Because we have already rejected Orleans' contention that the original structure was unauthorized, however, this argument fails for lack of its necessary factual basis.

■ We also reject Orleans' contention that the Corps was required to make specific findings of fact regarding whether the repairs violated any of the conditions set forth in 33 C.F.R. § 323.4–3(b). The purpose of the nationwide permit system is to allow certain types of discharges to be made without prior Corps approval: if a private party, acting under the assumption that its discharge is allowed under a nation-

---

**14.** This regulation was superseded in 1982. *See* 47 Fed.Reg. 31,800 (1982). Section 323.4–3(a)(5) allowed the "repair, rehabilitation or replacement" of any "currently serviceable fill discharged prior to the requirement for authorization" providing that the work did not result in a deviation from the specifications of the original fill. Additionally, the repair or replacement was required to satisfy seven conditions set forth in 33 C.F.R. § 323.4–3(b), relating to the safety of the discharge to the environment.

**15.** Even so, Orleans' argument would be valid only if the repairs were to that portion of the levee blocking the Drill Hole Canal. These particular repairs appear to have been made in the southern levee of the C.I.T. tract, and the Drill Hole Canal runs beside the west of the tract, but was closed by the levee near the southern end of the tract. We simply cannot be sure where the repairs were made from the information available to us.

wide permit, makes a discharge, that party bears the risk of liability for rectifying the harm done if in fact the discharge is not permitted. In this case, C.I.T. chose to seek the Corps' opinion before it repaired the levee. The fact that C.I.T. chose to seek the advice of the Corps prior to repairing the levees does not, in our opinion, serve to place upon the Corps an additional burden, not contemplated by the regulations, of making extensive findings of fact regarding compliance with section 323.4-3(b).

■ We note also that Orleans has been actively challenging the Corps' actions in this case since January 1980, and has had ample opportunity to present both to the Corps and the courts evidence which would indicate that the conditions of section 323.-4-3(b) were violated by the levee repairs challenged in this lawsuit. Orleans has not done so. At Orleans' request, the Corps spent nearly one year reconsidering its decisions not to require permits for the Drill Hole Canal closure and the levee repair. No evidence or legal argument having been presented which persuades us that the levee repairs were not authorized under the nationwide permit, we cannot say that the Corps acted arbitrarily or capriciously in failing to require a CWA permit before C.I.T. made the repairs.

### 3.

■ Finally, Orleans argues that the installations of two drainage culverts between the C.I.T. tract and an adjacent drainage canal violated the CWA because they resulted in the depositing of dredged or fill material into either the C.I.T. tract itself or into the Lincolnshire Canal, which drains into the Millaudon Canal, a navigable waterway. As was the case with the levee repairs, the record shows that C.I.T. informed the Corps of its intent to install the culverts beforehand and that Corps personnel inspected the site shortly after the work was completed. The Corps' on-site investigator reported that he found "no evidence of any discharges regulated under section 404 of the Clean Water Act." The record clearly indicates that after the culverts were installed, only clear water from within the C.I.T. tract flowed into the drainage canal. Clear water is not within the definition of a pollutant under the CWA.[16] Orleans contends, however, that a "plug" of dirt was washed through the canal during the installation of the culverts, and that this discharge of dirt, no matter how small, violated the CWA.[17] In its briefs, Orleans has contended that the "fact" that a plug of earth was washed away during the culvert installation is undisputed. The record does not support the contention that this was a "fact." Colonel Sands, in his deposition, explained that the Corps had no evidence before it which would confirm that dirt had been deposited either into the tract or into the canal. As he said, C.I.T. could easily have removed the earthen plug and deposited it elsewhere. Colonel Sands indicated in his deposition that the Corps would have asserted jurisdiction under the CWA if the on-site

---

**16.** Orleans has also argued that the drainage of water from the C.I.T. tract is prohibited by section 404(f)(2) of the CWA, which provides:

> Any discharge of dredge or fill material into the navigable waters incidental to any activity having as its purposes bringing an area of the navigable waters to a use which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters may be reduced, shall be required to have a permit under this section.

Orleans contends that the drainage is prohibited under this section because it is incidental to an activity which is intended to bring about the conversion of a wetland, the C.I.T. swamp, into a non-wetland area which can then be developed into a residential area without governmental approval. Although we are fully aware of this possibility, as is the Corps, we cannot require the Corps to exercise a jurisdiction that it does not possess. Section 404(f)(2) applies *only* when dredged or fill material has been discharged, and water is simply not dredged or fill material. Orleans' bald assertion that vegetation from the tract (which, it argues, constitutes a pollutant) is also being removed through the culverts is not supported by the record.

**17.** The government has, in another case, expressed the position that *de minimis* discharges do not require permits under section 404 of the CWA. *See Avoyelles Sportsmen's League,* 715 F.2d at 919–20, n. 37.

inspector had found evidence of the depositing of dredged or fill material. His testimony reflects a necessary deference to the field inspector's findings of fact. Just as Colonel Sands, as an administrator, must rely on the reports of his subordinates to determine whether the necessary facts for exercise of the Corps' jurisdiction are present, we, as a reviewing court, must grant considerable deference to the agency's findings of fact. In this case, Colonel Sands had before him a report from his field inspector indicating that no dredged or fill material was deposited. Relying on this report, and having no concrete information which would indicate that the field inspector was in error, Colonel Sands agreed that the Corps had no jurisdiction under section 404 to require C.I.T. to obtain a permit for the culvert installation. His reliance on this report appears to have been in good faith, and we find no basis for holding that Colonel Sands' decision was arbitrary or capricious. Even assuming that the report was erroneous, we cannot find in the record before us any indication that Colonel Sands' reliance upon the findings of the field investigator was so unreasonable as to indicate that the Corps' handling of this matter was actionable under the APA.

### C.

█ Orleans has argued that the first two of the actions challenged in this lawsuit, the blockage of the canal and the repair of the levees, violated section 10 of the RHA.[18] Although it also alleged claims under section 9 of the RHA in its complaint, Orleans has not argued these claims on appeal.

### 1.

█ Orleans argues that the decision not to require an after-the-fact permit for the closure of the Drill Hole Canal was

arbitrary and capricious because it contravened section 10 of the RHA. However, Colonel Sands clearly based his decision not to require a permit on 33 C.F.R. § 322.4(g). That section created a nationwide permit for "[s]tructures or work completed before 18 December 1968 or in waterbodies over which the District Engineer has not asserted jurisdiction provided there is no interference with navigation." The Corps interpreted this regulation to exempt from the permit requirement any structure or work completed in a waterway before the Corps asserted jurisdiction over that waterway. We have already discussed the fact that the Corps did not assert jurisdiction over canals such as the Drill Hole Canal until several years after the Drill Hole Canal was blocked. As long as the Corps' interpretation of the exemption is not arbitrary or capricious, we must not disturb its decision not to require a section 10 permit. We realize that section 322.4(g) could plausibly be read to exempt only those structures completed in waterbodies over which the Corps had not exerted jurisdiction in July 1977, when the regulation was promulgated. However, we also find that the Corps' reading of the regulation is not unreasonable, particularly in the light of the recent cases, discussed in part IV.B.1, *supra,* holding that the Corps may not retroactively apply its permit requirements when to do so would be manifestly unfair. In any event, for reasons not apparent to us, Orleans has chosen not to raise this argument. Rather, it has argued that section 322.4(g) exempted only the *repair* of structures which were completed prior to the Corps' assertion of jurisdiction. This argument is clearly based on a misreading of the plain words of the regulation. The regulation plainly exempts the structure itself, in this case, the dam across the Drill Hole Canal. Neither Orleans' argument nor our own reading of the regulation con-

---

**18.** Although the Supreme Court held, in *California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981), that the RHA does not provide a private cause of action for enforcement of its provisions, a federal court may review agency actions alleged to be in violation of

the RHA under the provisions of the APA. Jurisdiction is based on 28 U.S.C. § 1331. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Glacier Park Foundation v. Watt,* 663 F.2d 882, 885 (9th Cir.1982).

vinces us that the Corps acted arbitrarily or capriciously in applying section 322.4(g) to this situation.

Orleans' second line of argument is that, even if an activity was specifically exempted by section 322.4(g) from the mandatory permit requirement, the Corps retained discretionary authority to require an RHA permit under 33 C.F.R. § 323.4–4, discussed in part IV.B.1, *supra.* This argument is, again, based upon a misreading of the regulation: section 323.4–4 applied only to projects exempted under the nationwide permits promulgated under the CWA, not the RHA.

On its face, Colonel Sands' decision that the canal closure was not subject to an individual permit requirement was neither arbitrary nor capricious. Orleans' arguments do not convince us to the contrary.

### 2.

■ Orleans also asserts that the levee repairs made by C.I.T. in 1979 were subject to an RHA permit requirement. Colonel Sands reached the opposite conclusion, based on the nationwide permit found at 33 C.F.R. § 322.4(c), which exempted the following activities from the permit requirement:

> The repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure or of any currently serviceable structure constructed prior to the requirement for authorization; provided such repair, rehabilitation, or replacement does not result in a deviation from the plans of the original structure, and further provided that the structure to be maintained has not been put to uses differing from uses specified for it in any permit authorizing its original construction; ...

Orleans' argument is that section 322.4(c) cannot be applied to this repair project

because it was neither "previously authorized" nor "constructed prior to the requirement for authorization." We have already concluded that the levee in question was completed before the Corps asserted jurisdiction over the canal, when no authorization by the Corps was required. Therefore, Colonel Sands' finding that the levee repair fell into this category of the nationwide permit was completely justified.

We find that the Corps' decisions described above were in accordance with its own regulations and the terms of the RHA. It follows that these decisions were not arbitrary or capricious.

### V.

Orleans has raised a number of arguments which we have not specifically addressed in this opinion. These relate primarily to Orleans' contention that the Corps, particularly Colonel Sands, has acted in bad faith in handling this case. We find no evidence in the record which supports this notion.[19] We are convinced that the Corps was reasonable in finding that C.I.T.'s actions in enclosing the tract[20] and repairing the levees were allowed under nationwide permits under both the CWA and RHA and that the installation of the drainage culverts did not involve a discharge regulable under the CWA. The Corps' refusal to require C.I.T. to obtain individual project permits for these acts was not, therefore, arbitrary and capricious. Therefore, the judgment of the district court is

AFFIRMED.

---

19. Orleans' assertion that Colonel Sands made misrepresentations to personnel of the Environmental Protection Agency is not supported by the record.

20. Orleans, in a post-argument letter brief, has suggested for the first time in this appeal that the construction of ring levees around the C.I.T. tract was not authorized. Previously, Orleans had argued only that the portion of the levee which actually blocked the Drill Hole Canal was unauthorized. This issue, raised at such a late date, has not been properly brought before this court for our consideration in this appeal.